**MATHEWS READYMIX, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 97–1696.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1998.

Decided Jan. 29, 1999.

Roger K. Quillen argued the cause and filed the briefs for petitioner.

Meredith L. Jason, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Charles Donnelly, Supervisory Attorney.

David Rosenfeld was on the brief for amicus curiae General Teamsters, Professional, Health Care and Public Employees, Local 137, International Brotherhood of Teamsters, AFL–CIO.

Before: GINSBURG and HENDERSON, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG:

GINSBURG, Circuit Judge:

In reliance upon decertification petitions signed by the employees it had hired as permanent replacements for strikers, Mathews Readymix, Inc. withdrew recognition from the union that had represented its workforce. The National Labor Relations Board determined that Mathews violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5), because an unremedied unfair labor practice tainted the petitions for decertification. The Company petitions for review, arguing that substantial evidence does not support the Board's conclusion; the Board cross-applies for enforcement of its order. For the reasons set out below, we grant the petition for review and enforce only those portions of the Board's order that Mathews does not contest.

## I. Background

Mathews is a California corporation engaged in the manufacture and distribution of ready-mix concrete. Until the events that culminated in this petition for review, it had a 30–year history of collective bargaining with Local 137 of the International Brotherhood of Teamsters. The last collective bargaining agreement between Mathews and the Union expired on March 31, 1992 and the next day the Union began an economic strike in which all 41 bargaining unit employees joined. Mathews hired replacement employees and on April 8 informed the Union that all the striking employees had been permanently replaced. During the hiring process 34 of the new hires had filled out a personnel form that asked, among other things, whether the potential employee was a member of a

union and, if so, the name and address of that union.

At least two of the replacement employees, Walter Scott Paul and Dave Roberts, drafted petitions to decertify the Union. At an April 11 safety meeting for Mathews' drivers, some of the replacement employees expressed to management their concern that they would themselves be replaced when the strike ended. One of the drivers, David McCasland, asked management about the petitions for decertification, which Paul and Roberts had circulated during a break. The CEO of Mathews' parent corporation, Greg Dagnan, replied: "[I]t's not up to management . . . . It's none of [the Company's] business as to how [the employees] sign or do not sign any petition." At the end of the safety meeting, Roberts received permission to hold a short meeting for employees only. At that meeting, Roberts informed those drivers who remained of his and Paul's petitions, which Roberts described as a way to "help us avoid anymore [sic] conflict with the striking Teamsters." A number of employees signed the petitions at that meeting.

In the days following the April 11 meeting, the manager of one of Mathews' plants asked McCasland why he had not signed a petition. McCasland said that he would think about it and the next day did sign a petition. The manager then asked McCasland to approach two others, Ken Harris and Robin Magby, about signing a petition. At McCasland's request Harris signed a petition despite having already done so at the April 11 meeting. Magby refused to sign, stating that he "was looking to move into a management position" and "didn't feel it would be right" to sign.

As of April 21, all but one (Magby) of the approximately 52 replacement employees working for Mathews had signed a petition. On that date, the Company informed Local 137 that it had a good faith doubt that the Union continued to enjoy the support of a majority of the bargaining unit and that Mathews was therefore withdrawing its recognition of the Union as the exclusive representative of the employees.

The Union filed unfair labor practice charges alleging that Mathews had unlawfully interrogated and solicited McCasland and refused to bargain with the Union. The Board issued a complaint, which the General Counsel amended during the hearing to include Mathews' use, as an application for employment, of the form asking about the applicants' union membership. The Administrative Law Judge issued findings and conclusions, holding that the inquiry into the union membership of applicants, and the manager's interrogation of McCasland each violated § 8(a)(1) of the NLRA. According to the ALJ, the application form, when used during a strike, "may be considered to be coercive in nature, regardless of [Mathews'] motivation," which the ALJ found was benign. The ALJ also held that the solicitation of McCasland was "[c]learly . . . coercive interrogation and unlawful interference with employees' rights to engage in or refrain from engaging in union activity," in violation of § 8(a)(1). The ALJ concluded, however, that neither of the violations tainted the signatures supporting decertification, except for McCasland's which he found was solicited by management, because "any causal connection between [the Company's] preemployment interrogation and the employees' willingness to sign a petition to decertify the Union was tenuous at best." Because the 51 signatures constituted a clear majority of the bargaining unit, the ALJ found that the Company had a good faith doubt about the Union's majority status and that its withdrawal of recognition did not violate §§ 8(a)(1) and (5) of the NLRA.

The General Counsel filed exceptions before the Board which four years later reversed the ALJ's decision in part by a 2–1 vote. Mathews defended the ALJ's conclusion that its withdrawal of recognition was not unlawful but did not contest either of the ALJ's unfair labor practice findings, which the Board of course affirmed. *See Mathews Readymix, Inc.,* 324 N.L.R.B. No. 152, at 5, 1997 WL 709946 (Nov. 7, 1997). Reversing the ALJ on the lawfulness of the withdrawal, the Board found that the coercive interrogation of "all of the replacement employees who completed the form" tainted the petitions for decertification. *Id.* at 3. The Board reasoned as follows:

Given the [use of the application form to hire replacements for striking employees], we find it reasonable to infer that the unlawful interrogation would cause employees to become disaffected from the Union. The interrogation was directed to approximately 34, or two-thirds, of all of the employees who later signed the decertification petition. Further, the interrogation occurred in connection with the hiring process, thus employees could reasonably believe that their hire or retention was dependent upon their rejection of the Union. Finally, we note the brevity of time between the unlawful interrogation and the employees' ostensible rejection of the Union. *Id.* at 4.

The Board responded to only one of Mathews' counterarguments, stating that it was "not persuaded that the employees signed the petition *because* they were replacements." *Id.* at 4–5 (emphasis in original). The Board then found that Mathews committed other § 8(a) violations in its dealings with the Union and with the replacement employees after it had withdrawn recognition.

Member Higgins dissented in part, on the ground that there was no causal connection between the unlawful application form and the decision of the employees to seek decertification. Higgins emphasized three facts: "(1) the replacements were not in the unit when the Union was selected ... ; (2) the replacements crossed the Union's picket line ... during the Union's strike; [and] (3) the replacements were concerned that they would be terminated when the strike ended." *Id.* at 7. Describing the Board's reliance upon the admittedly unlawful application form as a "legal fiction," Higgins noted that no replacement ever mentioned that form "before, during, or after the process of obtaining [the] signatures"; he concluded that it was unreasonable to believe that the form "would, by itself, make the individual eager to prove ... that he/she was antiunion." *Id.*

## II. Analysis

 In its petition for review, Mathews challenges the sufficiency of the evidence supporting the Board's conclusion that the application form tainted the subsequent peti- tions for decertification, as well as the Board's findings of post-withdrawal unfair labor practices and the related remedial orders. Although the Board's findings of fact are conclusive if supported by substantial evidence, *see Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C.Cir.1991), when the Board reverses an ALJ it "must make clear the basis of its disagreement." *United Food & Commercial Workers Int'l Union, Local 152 v. NLRB*, 768 F.2d 1463, 1470 (D.C.Cir.1985). In reviewing the record for substantial evidence, "we consider not only the evidence supporting the Board's decision but also 'whatever in the record fairly detracts from its weight.'" *Schaeff Inc. v. NLRB*, 113 F.3d 264, 266 (D.C.Cir.1997) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). We are also mindful of the Supreme Court's recent teaching that when "the Board purports to be engaging in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 118 S.Ct. 818, 829, 139 L.Ed.2d 797 (1998).

 A union enjoys an irrebuttable presumption of majority support while a collective bargaining agreement is in effect. After the agreement expires the presumption becomes rebuttable and an employer may withdraw recognition if it can demonstrate that the union does not in fact enjoy majority support or if it has a good faith doubt that the union enjoys majority support. *See Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1458 (D.C.Cir.1997). A petition to decertify the union signed by a majority of the employees in the bargaining unit is ordinarily sufficient evidence to rebut the presumption of majority support; but if the General Counsel "comes forward with evidence to show that the union's decline in support was attributable to the employer's misconduct, the employer's good-faith defense to the withdrawal of recognition will fail." *Sullivan Indus. v. NLRB*, 957 F.2d 890, 898 (D.C.Cir.1992).

In this case, it is uncontested, on the one hand, that Mathews committed an unfair labor practice by using an employment application that inquired into the applicant's union membership, and on the other, that the petitions for decertification, if not attributable to the unfair labor practice, provided Mathews with a good faith doubt that the Union enjoyed majority support. In order to determine whether there was a causal relationship between the decertification petitions and the unremedied unfair labor practices, the Board considered the four factors that it had set forth in *Master Slack Corp.*, 271 N.L.R.B. 78 (1984), and we had approved in *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1236 (D.C.Cir.1992):

> (1) The length of time between the unfair labor practices and the employee petition; (2) the nature of the unfair labor practices, including whether they are of a nature that would cause a detrimental or lasting effect on the employees; (3) the tendency of the unfair labor practices to cause employee disaffection with the union; and (4) the effect of the unlawful conduct on the employees' morale, organizational activities, and membership in the union.

Mathews concedes the unfair labor practice and the petitions were in essence contemporaneous: the petitions had been circulated and signed and recognition was withdrawn a mere 11 days after it ceased using the application form. The Company argues, nonetheless, that the Board ignored evidence tending to undermine its conclusion that the employees were, owing to the timing and context of the unlawful inquiry, "likely to have remembered the question regarding union membership on the personnel records form when they signed the petitions to decertify the Union." *Mathews*, 324 N.L.R.B. No. 152, at 4. We must agree.

First, as Mathews points out, the application form asked not only whether the potential employee was a union member but also, if so, for the union's name and address. Potential employees were not given any explanation for this request, but the most obvious inference is that the employer wanted to be able to send mail to the union. This innocuous inference is reinforced by the form as a whole, which is headed "EMPLOYEE TO COMPLETE PERSONNEL RECORDS" and contains blank spaces for the applicant's name, social security number, address, spouse's name, driver's license number, person to notify in case of emergency, and the offending information. This is not to quarrel with the Board's holding that, as a matter of law, the question constituted "coercive interrogation" in violation of § 8(a)(1). Mathews' point is only that nothing about the context in which the question appears draws attention to it or otherwise suggests that it would leave a memorable impression upon the applicant. And as the Board itself recognizes, more than a bare-bones violation of § 8(a)(1) is needed to support the inference that the employer's unlawful conduct may have influenced the employees to sign a petition to decertify the Union. *Cf. General Indus. Employees Union, Local 42 v. NLRB*, 951 F.2d 1308, 1313 (D.C.Cir.1991) (Board has decided "on several occasions that an unlawful practice not fully cured ... nevertheless was not, or had ceased to be, a reason underlying a strike").

Second, both Paul and Roberts, each of whom had completed the unlawful application form, initially hid from the Company their efforts to decertify the Union. Paul testified before the ALJ that "[m]anagement didn't know about [the petition]. And I felt that if they'd seen something passed around, they may grab it and see what it is." Roberts testified that he "was kind of sneaking around getting these signatures." The Board's speculation that the application form "would likely make [the employees] eager to prove to [Mathews] that they were free of any prounion sentiments" does not square with the actual attitudes of the employees who initiated the effort to decertify the Union; neither of them was eager even to let the Company know what he was up to, apparently because they were not at all confident that management would not disapprove of their anti-union activity.

Third, the CEO of Mathews' parent company explicitly told a group including many of the eventual signatories that the petition drive was "none of [the Company's] business." Even if the unlawful question on the

application form was on the employees' minds when they entered that meeting, therefore, any connection between the form and their subsequent decision to sign the petitions was surely severed by this statement from the highest level of management.

Fourth, the 17 replacement employees who never saw the unlawful application form, like the 34 employees who did, all signed a petition for decertification. The causal inference that the Board draws from the unanimity of those who filled out the form, therefore, is belied by the like unanimity of those who did not; both groups—the exposed group and the control group, as it were—equally and to the last man opposed continued representation by the Union.* The only fair and sensible inference is that there was no causal connection between the application form and the petitions.

■ Finally, as the dissenting Board Member noted, those signing the petitions were replacement employees who had crossed the striking Union's picket line; some of them had openly expressed their fear that Mathews and the Union would ultimately come to terms that would include the termination of their employment. The Board need not, of course, adopt a presumption that replacement employees are antiunion. *See NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 791, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1989). Neither, however, may the Board ignore evidence that the replacement employees in a specific case, by virtue of their being replacements, are in fact opposed to the employer's continued recognition of the union. In this case, there was testimony before the ALJ that "[s]ome of the [employees] were nervous . . . . [and] wanted to know once the strike was over, would they be replaced." The only reasonable inference is that their expressed fear of being discharged because they were replacements, not the unmentioned but lingering effect of a question on the application for employment they had filled out, motivated them to sign the petitions.

These five pieces of evidence, in combination, forcefully contradict the limited evidence upon which the Board relied in reaching its conclusion, namely, the employment application itself and the short period between the time the replacement employees filled out the application and the time they signed the petitions to decertify the Union. Considering all the evidence in the record, we think it apparent that substantial evidence does not support the Board's finding that the application form tainted the petitions for decertification upon which Mathews based its good faith doubt of the Union's majority support.

We need not go into the other § 8(a) violations the Board found Mathews committed after withdrawing recognition from the Union. All depend upon the withdrawal of recognition being unlawful; that predicate having been removed, they cannot stand.

## III. Conclusion

For the foregoing reasons, Mathews' petition for review is granted and the Board's application for enforcement is granted only insofar as it remedies Mathews' uncontested pre-withdrawal violations of § 8(a)(1).

*So ordered.*

---

* The Board points to no evidence suggesting that those who did not see the form firsthand were nonetheless aware of the question about union membership or even of the manager's solicitation of McCasland, which the Board treats not as an independent source of taint, but merely as "conduct consistent with the antiunion atmosphere created by [the application form] interrogation." *Mathews*, 324 N.L.R.B. No. 152, at 4.