216 F.3d 92 (D.C. Cir. 2000)
 Traction Wholesale Center Co., Inc.,Petitioner
v.
National Labor Relations Board, Respondent
 No. 99-1336
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued April 20, 2000
Decided June 30, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board
 Terrence J. Nolan argued the cause for petitioner. With him on the briefs was Christopher H. Mills.
 Rachel I. Gartner, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Supervisory Attorney, and Jill A. Griffin, Attorney.
 Before: Randolph, Tatel and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Tatel.
 Concurring statement filed by Circuit Judge Randolph.
 Tatel, Circuit Judge:
 
 
 1
 Petitioner challenges the National Labor Relations Board's determination that it committed unfair labor practices in response to a union organizing campaign. Petitioner also challenges the Board's imposition of a bargaining order. Because we conclude that the Board's unfair labor practice determinations are supported by substantial evidence and that the Board adequately explained the need for the bargaining order, we deny the petition for review of those issues and grant the Board's cross-petition for enforcement.
 
 
 2
 * Petitioner Traction Wholesale Center Company, Inc., a wholesale tire distributor, buys tires and wheels from manufacturers and larger distributors, reselling them to tire retailers and gas stations. Operating out of four warehouses--two in New Jersey and one each in Delaware and Philadelphia-Traction employed approximately thirty-six people at the time of the events that gave rise to this case. Traction Wholesale Ctr. Co., Inc., 328 NLRB No. 148, 1999 WL 1186753 at *10 (July 28, 1999). The unfair labor practices at issue occurred when Traction learned that a union had garnered support from a majority of its employees. As determined by an administrative law judge, the relevant facts are as follows.
 
 
 3
 In March 1997, several Traction employees approached Charles Schiavone, one of the company's Philadelphia drivers, "seeking guidance on how to form a union." Id. at *10. A seven-year Traction veteran, Schiavone contacted and met with the Teamsters Union, Local No. 115, about organizing warehouse employees and drivers working in the company's four warehouses. At the end of that meeting, Schiavone signed a union authorization card designating the union as his "chosen representative in all matters pertaining to wages, hours, and working conditions." Id. He also took blank authorization cards to distribute to Traction drivers and warehousemen. During the next month, Schiavone kept the union apprized of his organizing efforts. By April 14, the union had received signed authorization cards from eleven of Traction's twenty drivers and warehousemen. Id. at *11.
 
 
 4
 Armed with the eleven authorization cards, two union representatives went to the Philadelphia warehouse on April 15 to ask Traction to recognize the union. There they met with the on-site manager, Scott Adams, and showed him the signed authorization cards. Id. at *11. When Adams told the union representatives that he had no authority to recognize the union, they asked him to deliver a letter to Traction's owners, Joseph O'Donnell and Jeffrey Cohen, in which the union demanded recognition. Id. at *12.
 
 
 5
 Immediately after the union representatives left, Adams summoned Schiavone to his office, telling him that he was upset that Schiavone had not told him about the union organizing effort and demanding to know who had started it. Id. at *15, 22. Adams warned that Traction would either close the warehouse or subcontract for delivery services if the union campaign succeeded. Id. at *15. If Schiavone "wanted to be a union thug like other union supporters who destroy other people's property," Adams said, "then go right on ahead." Adams then told Schiavone to "get the fuck out of here." Id. When Schiavone called Adams the next morning asking whether he should return to work, Adams told him that he had been fired. Id.
 
 
 6
 On the same day that the union representatives met with Adams and showed him the eleven signed cards, Adams asked Kevin Tryon, another Philadelphia driver, whether he had signed an authorization card. Id. at *16, 23. When Tryon, who in fact had signed a card, answered no, Adams revealed that he had seen Tryon's signature on a card. Id. at *16. Later that evening, Adams told Tryon that Traction would "rather pay niggers $5.00 an hour" than work with the union. Id. He also told Tryon that Traction was "not afraid to close down, if that's what it takes." Id.
 
 
 7
 That same day, Adams announced two policy changes for the Philadelphia warehouse. First, employees would have to begin "punching out" and "punching in" on the time clock to document that they took no more than thirty minutes for lunch. Id. at *16-17. Second, employees could no longer use company vans after work for personal reasons. Id. Until this announcement, Adams had allowed such use even though company policy prohibited it.
 
 
 8
 The union then filed a representation petition, and the Board ordered an election. During the two months before the election, Traction's two owners and Adams conducted two meetings with the Philadelphia drivers and warehousemen that led to additional unfair labor practice charges. At the first meeting, on April 23, Adams told Tryon that although he was "due for a raise, he would not be getting it...." Id. at *18. Also during that meeting, Cohen (one of the owners) asked the employees what Traction had done to make them bring in a union, telling them not only that Traction could offer them more than the union, but that if they had any personal or job-related problems, Traction could help. Id. at *18, 24. At a second meeting, this one on June 3, Cohen told the employees that Traction would "give them more than the union" and that once they "got past this thing, we can move on to something bigger and better." Id. at *24.
 
 
 9
 The union lost the election. Sixteen employees voted against the union, two voted for it, and two ballots were contested. Id. at *19. Following an evidentiary hearing, an administrative law judge found that Traction had committed a series of unfair labor practices in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3), by firing Schiavone, denying Tryon's raise, and changing its policies with respect to personal use of vans and clocking in and out for lunch. Id. at *37. The ALJ also concluded that Adams' comments to both Schiavone and Tryon amounted to unfair labor practices in violation of section 8(a)(1), as did Cohen's comments to Traction's Philadelphia employees. Id. The ALJ recommended that the Board invalidate the election and issue a bargaining order.Id. at * 38.
 
 
 10
 The Board agreed that Traction had committed the enumerated unfair labor practices and that a bargaining order was appropriate. Id. at *1. The Board disagreed with the ALJ on just one issue. Despite concluding that Traction had committed an unfair labor practice by changing its van policy, the ALJ recommended no remedy because Traction had offered evidence that its insurance policy would not cover personal use of company vans. Id. at *38 n.30. Without explanation, the Board ordered Traction to rescind its personal use prohibition. Id. at *1 n.2. Member Brame dissented on two grounds: he thought that Cohen's remarks at the April 23 and June 3 meetings did not amount to unfair labor practices; he also thought the bargaining order inappropriate because, in his view, the union had never attained majority support. Id. at *5-6.
 
 
 11
 In its petition for review, Traction argues that the unfair labor practice charges stemming from the Schiavone firing, the changed van policy, the denial of Tryon's raise, and Cohen's comments are not supported by substantial evidence in the record. Traction also challenges two of the Board's remedies: the reinstatement of its personal van use policy and the bargaining order. With respect to the latter, Traction argues that the Board failed to satisfy this circuit's strict standards for imposing bargaining orders. See, e.g., Avecor, Inc. v. NLRB, 931 F.2d 924, 934-39 (D.C. Cir. 1990). The Board cross-petitions for enforcement.
 
 II
 
 12
 Section 8(a)(1) of the NLRA makes it an unfair labor practice for employers "to interfere with, restrain, or coerce employees" in the exercise of their rights "to selforganization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. §§ 158(a)(1), 157. Section 8(a)(3) makes it an unfair labor practice for employers "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Id. § 158(a)(3). To establish that an employer's conduct (in this case, Schiavone's firing, the change in van policy, and the denial of Tryon's raise) violates section 8(a)(3), the general counsel must first show that the "protected activity was a motivating factor in the adverse employment decision." Frazier Indus. Co., Inc. v. NLRB, 213 F.3d 750 (D.C. Cir. 2000) (internal quotation marks omitted). If this prima facie showing is made, the burden shifts to the employer to demonstrate that "it would have made the adverse decision even had the employee not engaged in protected activity." Vincent Ind. Plastics, Inc. v. NLRB, 209 F.3d 727, 735 (D.C. Cir. 2000) (citing Wright Line, Inc., 251 N.L.R.B. 1083, 1089 (1980)).In determining whether an employer had a discriminatory motive, "the NLRB may 'consider[ ] such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.' " Id. (quoting Power Inc. v. NLRB, 40 F.3d 409, 418 (D.C. Cir.1994)).
 
 
 13
 Our review of Board unfair labor practice determinations is quite narrow. "The Board's findings of fact, if supported by substantial evidence, are conclusive." Avecor, 931 F.3d at 928. In reviewing the Board's conclusions, "[w]e ask not whether [petitioner's] view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is reasonably defensible." Harter Tomato Prods. Co. v. NLRB, 133 F.3d 934, 938 (D.C. Cir. 1998) (internal quotation marks omitted). Moreover, "we must accept the ALJ's credibility determinations, as adopted by the Board, unless they are patently insupportable." Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243, 1246 (D.C. Cir 1994). "We are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial." Vincent Plastics, 209 F.3d at 734. Bearing this deference in mind, we turn to Traction's four challenges to the Board's unfair labor practice determinations.
 
 Schiavone Firing
 
 14
 This record contains more than substantial evidence to support the Board's conclusion that anti-union animus motivated the Schiavone firing. Adams fired Schiavone immediately after learning not only that the union had obtained eleven authorization cards, but that Schiavone had signed one. Equally indicative of anti-union animus, the ALJ concluded that Adams violated section 8(a)(1) by telling Tryon and Schiavone that the company would shut down before working with a union (a conclusion that Traction does not contest). See Vincent Plastics, 209 F.3d at 735 ("Evidence that an employer has violated section 8(a)(1) of the Act can support an inference of anti-union animus.").
 
 
 15
 Challenging the Board's determination that the general counsel had made out a prima facie case of anti-union animus, Traction maintains that Adams decided to fire Schiavone on April 11, four days before learning that employees had authorized the union. Traction claims that it decided to fire Schiavone because of two incidents having nothing at all to do with the union. The first involved Schiavone's alleged misuse of a company policy that entitled employees to discounts on tire purchases. When Schiavone bought tires in early April, he took not just the employee discount to which he was entitled, but also a discount available only to cash-paying customers. The latter discount reduced the price of the tires by an additional $6.59. The other incident involved graffiti that Adams found on the warehouse wall that said "Chuck" and "Chuck is cool." Schiavone's first name is Charles.
 
 
 16
 Adams testified that on April 11, after discovering that Schiavone had taken the extra discount and after seeing the graffiti, he told owner O'Donnell that he planned to fire Schiavone. Adams further testified that he and O'Donnell had agreed to fire Schiavone on Monday, April 14, but because one employee called in sick and another was on vacation on that day, he postponed firing Schiavone until the next day. O'Donnell's testimony confirmed the basic elements of Adams' story. Relying on Adams' and O'Donnell's testimony, Traction argues that Schiavone's firing could not have been motivated by discriminatory animus because on April 11--the day it decided to fire him--it was unaware of the union organizing campaign.
 
 
 17
 Traction's argument suffers from a fatal flaw: The ALJ credited neither Adams' nor O'Donnell's testimony. "It was patently obvious," the ALJ found, "that Adams could not keep his story straight on several matters, and that much, if not all, of his testimony was simply fabricated to suit [Traction's] case." Traction, 1999 WL 1186753 at *19. Calling Adams' testimony "self-contradictory and filled with inconsistencies," the ALJ rejected it as "simply not credible." Id.O'Donnell's testimony, the ALJ found, was "equally unpersuasive." Id. at *20. Traction has offered nothing to suggest that the ALJ's credibility determinations are "patently insupportable." See Exxel/Atmos, 28 F.3d at 1246. Absent O'Donnell's and Adams' testimony, all evidence in the record, including the timing of the firing and the section 8(a)(1) violations, points to anti-union animus.
 
 
 18
 A prima facie case of discriminatory animus having been established, Traction could have avoided an unfair labor practice finding only by demonstrating that it would have fired Schiavone regardless of his union activities. Traction failed to meet this burden. The Board concluded that neither the discount policy error nor the graffiti otherwise would have led to Schiavone's firing. Substantial evidence supports the Board's conclusion. O'Donnell testified not only that employees often made price code mistakes, but also that when they inadvertently took extra discounts, the company simply required repayment of the discounted amount. Traction, 1999 WL 1186753 at *27. Moreover, from his "observation of [Schiavone's] demeanor on the witness stand and throughout the hearing," the ALJ found that Schiavone was not "someone who would risk losing his job of 7 years for a meager $6.59." Id. With respect to Traction's other explanation for firing Schiavone, the ALJ credited Schiavone's testimony that the graffiti had been on the wall for close to a month before Traction fired him. Id. Disbelieving both Adams and O'Donnell and believing Schiavone, the ALJ thought it "strain[ed] credulity to believe that Adams, having declined to take action against Schiavone when he first observed the writing sometime in March, would decide one month later to discharge Schiavone, in part, for such activity." Id.
 
 
 19
 To be sure, the ALJ could have chosen to credit record evidence supporting Traction's version of events. The only question before us, however, is whether substantial evidence supports the Board's view of the disputed events, not Traction's. See Frazier, 213 F.3d at 756 (affirming Board's unfair labor practice finding because "[a]lthough [the employer's] interpretation of evidence may be reasonable, the Board's finding to the contrary was supported by substantial evidence"). Because we find no basis for questioning the ALJ's credibility determinations, we affirm the Board's conclusion that the Schiavone firing amounted to an unfair labor practice.
 
 Personal Use of Company Vans
 
 20
 Challenging the Board's determination that it violated sections 8(a)(3) and (1) by changing its van policy in retaliation for its employees' organizing efforts, Traction argues (as it did with respect to the Schiavone firing) that it could not have been motivated by anti-union animus. When O'Donnell told Adams to start enforcing the company policy prohibiting personal use of vans (on April 11), the company says, it did not know about the union's organizing efforts. According to Adams, O'Donnell told him to start enforcing the personal use prohibition because the company had received a summons for an unpaid New York parking ticket on one of the vans.Traction also offered a letter from its insurance company stating that its policy does not cover personal use of company vans. From this, Traction argues that substantial evidence does not support the Board's unfair labor practice determination.
 
 
 21
 Again, Traction misunderstands the substantial evidence standard. Having discredited both Adams' and O'Donnell's testimony, the ALJ found that they had not discussed the van policy on April 11. Traction, 1999 WL 1186753 at *31."[T]he more credible scenario, and the one I accept as true,"--and the one to which we owe deference--"is that Adams never received any such instruction from O'Donnell in the first place, and imposed the ban only after learning that his Philadelphia store employees were supporting the Union."Id. The ALJ also found that the insurance company letter could not possibly have motivated Adams' April 15 van policy announcement because the letter was dated May 14. Id. at *31 n.27. Absent Traction's proffered explanations, the only record evidence shows that employees were told on April 15, the same day Adams spoke with the union representatives, that he would start enforcing the van policy. Given this timing, together with Adams' threats to close the company if the union prevailed, the ALJ's conclusion that the enforcement of the van policy was motivated by discriminatory animus finds more than adequate support in the record.
 
 
 22
 Insisting that its van policy was not in fact motivated by anti-union animus, Traction maintains that after April 15, Adams made exceptions for certain employees, including Tryon, a known union supporter. Again, while such evidence may well support Traction's version of the events, the critical point is that substantial evidence supports the ALJ's view of the evidence. See Frazier, 213 F.3d at 756. We therefore find no deficiency in the Board's conclusion that the change in van policy constituted an unfair labor practice.
 
 
 23
 The Board's remedy is a different matter. The ALJ recognized that rescission was the ordinary remedy for this type of unfair labor practice, but he thought it "improper" to order Traction to rescind the unilateral change, i.e., to order it to reinstate its prior practice of allowing employees personal use of vans, because it "appears to be the case" that "such practice is prohibited by its insurance policy." Traction, 1999 WL 1186753 at *38 n.30. The Board disagreed. Stating only that "rescission ... is the customary remedy for the violations found in this case," it rejected the ALJ's recommendation and directed Traction to rescind "the unilateral changes in ... the van policy." Id. at 1 n.2. Of course, the Board "is free to substitute its judgment for the ALJ's," Local 702, Int'l B'hood of Elec. Workers, AFL-CIO v. NLRB, 2000 WL 520950 at *2 (D.C. Cir. 2000), but "when the Board reverses an ALJ it 'must make clear the basis of its disagreement.' "Mathews Readymix, Inc. v. NLRB, 165 F.3d 74, 77 (D.C. Cir. 1999) (quoting United Food & Commercial Workers Int'l Union, Local 152 v. NLRB, 768 F.2d 1463, 1470 (D.C.Cir. 1985). See also Chicago Local No. 458-3M v. NLRB, 206 F.3d. 22, 29 (D.C. Cir. 2000) ("In order for the court properly to review the Board's decision, it 'must be able to discern the rationale' underlying the Board's conclusions.") (quoting Oil, Chemical & Atomic Workers Int'l Union v. NLRB, 46 F.3d 82, 90 (D.C.Cir.1995)). Because the Board has failed to explain, in either its decision or its brief, why it disagreed with the ALJ that the insurance policy made rescission inappropriate, we grant the petition for review with respect to this issue and remand to the Board.
 
 Tryon Raise
 
 24
 In testimony credited by the ALJ, Tryon said that when he began working for Traction in early March, Adams told him that he would probably get a raise within thirty to sixty days.Tryon testified that at the April 23 meeting, Adams said:"You're due for your raise but now I can't give it to you because of the union." Adams denied promising Tryon a raise, explaining that when Tryon requested one, he refused because he thought it would be "improper" to give Tryon any benefits during the union organizing campaign. Traction, 1999 WL 1186753 at *29.
 
 
 25
 Again crediting Tryon's testimony over Adams', the ALJ found Adams' denial of the raise to have been motivated by anti-union animus. Id. at *28-29. As the ALJ concluded, because Adams had promised Tryon a raise, Adams was obligated to act as he would have had no organizing campaign been underway, i.e., to give him the raise. See Perdue Farms, Inc., Cookin' Good Div. v. NLRB, 144 F.3d 830, 836 (D.C. Cir. 1998) ("[A]s a general rule, an employer's legal duty in deciding whether to grant benefits while a representation proceeding is pending is to decide that question precisely as it would if the union were not on the scene.").
 
 
 26
 Traction argues that even if Adams had promised Tryon a raise within thirty to sixty days, because the denial of the raise had not occured until after sixty days, Tryon was no longer entitled to it, leaving Adams' explanation--that he denied the raise because of his concern that it might be viewed as an unlawful benefit--as the only credible evidence in the record. To accept this argument, we would have to infer from the fact that Tryon was told that he was entitled to a raise within thirty to sixty days that he was not entitled to the raise unless he asked for it before the sixtieth day. Not only do we think this rather unlikely, but more important, the ALJ chose not to draw this inference.
 
 Cohen Statements
 
 27
 Traction begins its challenge to the Board's determination that Cohen committed unfair labor practices at the employee meetings on April 23 and June 3 by claiming that substantial evidence does not demonstrate that Cohen even made the statements. This argument fails for the same reason that Traction's other substantial evidence challenges fail: the ALJ credited the General Counsel's witnesses and reached a different conclusion, a conclusion supported by substantial evidence. Not only did Tryon testify that Cohen made the statements, but Cohen never directly contradicted Tryon.Cohen did not testify at all about the June 3 meeting, and with respect to the April 23 meeting, "while generally denying making any unlawful remarks, [he] admitted to recalling 'absolutely nothing' of what he or O'Donnell may have said."Traction, 1999 WL 1186753 at *24.
 
 
 28
 Traction next argues that even if Cohen made the April 23 statements, they were not unlawful. (Traction does not appear to challenge the ALJ's ULP determination with respect to Cohen's June 3 comments). Tryon testified about Cohen's statements at the April 23 meeting as follows: "He just stated that if there was ever a problem, ... whether it be personal or job-wise, Traction was always there to help....Somebody from management or through the company was always willing to help or lend a hand." According to Tryon, Cohen also asked the employees "what it was that the company did wrong ... to bring somebody from the union into the company," and he told them that "Traction would be able to offer more than" the union.
 
 
 29
 Traction does not challenge the standard the Board uses to determine whether an employer's solicitation of grievances constitutes an unfair labor practice: Soliciting grievances is not in itself an unfair labor practice, but implicit or explicit promises to correct grievances may violate section 8(a)(1) because "the combined program of inquiry and correction" suggests that "union representation [is] unnecessary." Reliance Electric Co., 191 NLRB 44, 46 (1971), enf'd, 457 F.2d 503 (6th Cir. 1972). An employer who has not previously solicited grievances but who begins to do so in the midst of a union campaign creates a "compelling inference" that the employer is "implicitly promising" to correct the problems. Id. The ALJ found, and the Board agreed, that neither Traction nor Cohen had any past practice of soliciting grievances and that there was a "compelling inference" that Cohen was implicitly promising to correct any problems, a promise that was "clearly coercive and designed to show that [management] alone had the wherewithal to address and resolve employee problems." Traction, 1999 WL 1186753 at *1-2, 25.
 
 
 30
 Relying on Member Brame's dissent, Traction argues that it made no implied promise to correct grievances because "Cohen's alleged statement merely reflects his view of Traction's past practice with respect to its treatment of employees and cannot reasonably be construed as a promise to take any particular action in the future." Because Cohen's statements were framed in the past tense, Member Brame asserted, there is no "basis from which it can be inferred 'that the grievances will be remedied and [no] circumstances giving rise to the inference that the remedy will only be provided if the union loses the election.' " Traction, 1999 WL 1186753 at *6.
 
 
 31
 No doubt Member Brame's interpretation--that Cohen's statements referred only to Traction's past practice--is plausible. But the opposite interpretation, the one drawn by the ALJ and the Board, is equally plausible, and it is to the Board, not the dissenter, that we owe deference. According to both the Board and the ALJ, Cohen was "plainly sending the message that ... [Traction] was now (and would continue to be) willing to 'lend a hand or help' with any problems employees might have." Id. at *2. Moreover, because it is not at all clear whether Tryon was quoting Cohen or paraphrasing what Cohen had said--"He just stated that if there was ever a problem, ... Traction was always there to help"-we defer to the interpretation of the ALJ who heard the testimony and found that "at the April 23 meeting Cohen ... assured [employees] that if they had any personal or jobrelated problem, [Traction's] management team was there to help them." Traction, 1999 WL 1186753 at *24. We therefore think the Board had sufficient basis for inferring that Cohen's statements represented an implicit promise to correct grievances and, by extension, coercion in violation of section 8(a)(1). See Avecor, 931 F.2d at 931 ("We recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employeremployee relationship.") (internal quotation marks omitted).
 
 III
 
 32
 This brings us to the heart of this case--Traction's challenge to the bargaining order. Our starting point is the Supreme Court's decision in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575 (1969). "[W]here an employer has committed ... unfair labor practices [in addition to its refusal to bargain] which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside.... [the Board] has the authority to issue a bargaining order.... [T]he Board has the same authority even where it is clear that the union, which once had possession of [authorization] cards from a majority of the employees, represents only a minority when the bargaining order is entered." Id. at 610. Bargaining orders are sometimes necessary, the Court explained, because "[i]f an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-anddesist order by further unlawful activity. The damage will have been done...." Id. at 612.
 
 
 33
 Because bargaining orders can deprive employees of their section 7 right to choose their representative, this court has carefully delineated the circumstances under which the Board may issue such orders. Absent "outrageous and pervasive ULP's," the Board may issue a bargaining order only if it has substantial evidence that (1) "the Union, at some time, ...had majority support within the bargaining unit"; (2) "the employer's unfair practices ... had the tendency to undermine majority strength and impede the election process";and (3) "the Board [has] determine[d] that the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order." Avecor, 931 F.2d at 934. We also require the Board "to explicitly balance" several factors to determine whether the need for a bargaining order outweighs employees' section 7 rights to a representation election. Vincent Plastics, 209 F.3d at 734.
 
 
 34
 One additional principle guides our review of the Board's bargaining order. "In fashioning its remedies ... the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." Gissel Packing, 395 U.S. at 612 n.32."Our essential task as a reviewing court is to assure ourselves that the Board 'has considered the factors which are relevant to its choice of remedy, selected a course that is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.' " Caterair Int'l v. NLRB, 22 F.3d 1114, 1120 (D.C. Cir. 1994) (quoting Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35, 42 (D.C. Cir. 1980)).
 
 
 35
 Traction argues that the bargaining order was not justified because (1) the union never had majority support, (2) there is not substantial evidence to support a bargaining order, (3) the Board failed adequately to explain the need for the bargaining order, and (4) the Board failed to consider the effect of employee turnover. We consider each argument in turn.
 
 Majority Support
 
 36
 The Board found that a majority of the bargaining unit supported the union prior to the election because eleven of the twenty employees in the unit had signed cards designating the union as their "chosen representative in all matters pertaining to wages, hours and working conditions." Claiming that the Board should not have counted two of the eleven authorization cards, Traction argues that the union never enjoyed majority support.
 
 
 37
 One of the disputed cards was Anthony Hess's. In support of its claim that this card should not have been counted, Traction points to Hess's testimony that he had not read the card before signing it, that he had not understood that by signing he was authorizing the union, and that he had been told that the only effect of signing would be that the union could hold an election. The ALJ, however, discredited this testimony, relying instead on Hess's earlier affidavit in which he said that he had in fact read the card before signing. Traction, 1999 WL 1186753 at *33. Finding that Hess had both read and understood the card, the ALJ counted it. Because Traction has offered nothing to suggest that the ALJ's credibility determination is "patently insupportable," we have no basis for questioning his conclusion. See Exxel/Atmos, Inc. v. NLRB, 28 F.3d at 1246.
 
 
 38
 The other disputed card was James Michener's. Michener never testified, nor did any witness testify to having seen him sign the card. The ALJ authenticated the card by comparing the signature on it with Michener's signatures on two forms in Traction's personnel files: his employment application and a signed copy of the company's work rules. Traction, 1999 WL 1186753 at *33-34. Agreeing with the ALJ that the card was authentic, the Board not only examined the two documents itself, but also compared the signature on the card to Michener's W-4 federal income tax withholding form. Id. at *2-3.
 
 
 39
 Not contesting the authenticity of the three documents on which the ALJ and the Board relied, Traction argues that the signatures on those documents have never been properly authenticated. It relies on Federal Rule of Evidence 901(b)(3), which it says requires the Board to compare the signature on a card to an authenticated signature, not just to a signature on an authentic document. Rule 901 provides:
 
 
 40
 (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims;
 
 
 41
 (b) Illustrations. By way of illustration only, and not byway of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
 
 
 42
 * * *
 
 
 43
 (3) ... Comparison by the trier of fact or by expert witness with specimens which have been authenticated.
 
 
 44
 We do not share Traction's interpretation of Rule 901. Not only is subparagraph (3) "by way of illustration only," but Rule 901 "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a). Surely evidence that the signed documents came from Traction's business files and that the company relied on one of them to hire Michener and another to withhold federal income taxes is "sufficient to support a finding" that the signature appearing on them--James P. Michener--is in fact Michener's. See Weinstein's Federal Evidence § 901.05[2][b] at 901-26 (listing business records as an illustration of a method for authenticating handwriting specimens). For decades, moreover, the Board has treated employee documents from an employer's personnel files as genuine specimens for purposes of authenticating signatures on authorization cards. See, e.g., Aero Corp., 149 NLRB 1283, 1287 (1964), enf'd 363 F.2d 702 (D.C. Cir. 1966); Heck's, Inc., 166 NLRB 186 n.1 (1967).
 
 
 45
 Nothing in Be-Lo Stores v. NLRB, 126 F.3d 268 (4th Cir. 1997), on which Traction relies, persuades us otherwise. In that case, the Fourth Circuit took the Board to task for counting "highly questionable Union authorization cards," including thirteen cards "based upon [the ALJ's] comparison of the signatures on the cards with the signatures on the respective employees' W-4 forms." Id. at 279. But because the court made this statement only after it had concluded that a bargaining order was not warranted and because it indicated that the authorization card issue "only contribute[s] to our concern that the Union's majority status was one of agency construct, rather than grassroots support," id. at 280, we view the statement as dictum. In any event, to the extent that BeLo suggests that Rule 901 precludes authenticating signatures by comparing them to signatures on authentic business records including W-4 forms, we disagree and find that the Board, consistent with long-standing policy, satisfied Rule 901 by comparing the signature on the challenged authorization card with Michener's signature on the three authentic employment forms.
 
 Substantial Evidence
 
 46
 Traction's second challenge to the bargaining order--that it is not supported by substantial evidence in the record-requires little discussion, for the Board's order easily satisfies the standards we set forth in Skyline Distributors, Inc. v. NLRB, 99 F.3d 403, 410-11 (D.C. Cir. 1996). There, we summarized the factors justifying a bargaining order as follows:
 
 
 47
 "First, an unfair labor practice that is viewed as 'deliber-ate' or 'calculated' is more likely to lead to a bargaining order than one that is not. Second, much turns on the significance of the interest being endangered. If the employer's statements or acts can be characterized as threatening either a significant economic interest, such as retention of jobs, or a fundamental legal right, it ismore likely to lead to a bargaining order. Third, acts of reprisal, particularly discharges, are considered to beextremely effective in swaying votes and very difficult tore medy. Not only is there a great deal of language tothis effect in Board opinions, but also the coincidence of section 8(a)(3) violations and bargaining orders is nota-ble. Fourth, promises to correct the grievance that led to union organization are also considered particularly effective. Finally, and most significantly, the vast major-ity of bargaining order cases involve a series of unfair labor practices rather than a single act of illegality."
 
 
 48
 Skyline, 99 F.3d at 411 (quoting Julius G. Getman & Bretrand B. Pogrebin, Labor Relations: The Basic Processes, Law And Practice 76 (1988) (footnotes omitted)).
 
 
 49
 Beginning with the first factor, we have no doubt that Traction's unfair labor practices were " 'deliberate' or 'calculated.' " The ALJ found that Traction's response to the union organizing drive, particularly Adams' interrogation of Tryon and Schiavone and Adams' threat that Traction would "close down, if that's what it takes," were "clearly designed to nip the Union's organizational drive in the bud." Traction, 1999 WL 1186753 at *21, 35. Adams' comments, moreover, threatened "a significant economic interest," indeed perhaps the employees' most significant economic interest--"retention of jobs." (Factor 2). Not only did Traction threaten to close down or hire others, but by firing Schiavone, the person most identified with the union, the company made clear that by voting for the union, employees risked their jobs. (Again, Factor 2). Traction's "acts of reprisal, particularly [Schiavone's] discharge[ ]" in violation of section 8(a)(3) "are considered to be extremely effective in swaying votes and very difficult to remedy." (Factor 3). Repeatedly interrogating employees, Adams sought to learn what grievances led to the union campaign, and both Adams and Cohen suggested that they would correct those grievances and that employees would get "bigger and better things" by rejecting the union.Put another way, they "promise[d] to correct the grievance that led to union organization." (Factor 4).
 
 
 50
 Finally, this case involved "a series of unfair labor practices rather than a single act of illegality." (Factor 5). For starters, Traction's response to the union organizing drive was "immediate, swift, and retributive." Traction, 1999 WL 1186753 at *35. Summoning Schiavone to his office, Adams interrogated him about his union activity, then fired him. The company "did not stop there." Id. Adams twice interrogated Tryon, denied Tryon's raise, threatened to close the Philadelphia warehouse, and imposed new and retributive policies on Philadelphia employees. At two employee meetings, Cohen committed additional unfair labor practices. Taken together, the evidence reveals a company engaged in a course of retribution designed not only to punish employees who gave the union its strongest support, but also to intimidate other employees into voting against the union. And contrary to Traction's argument, the effects of its actions extended well beyond the Philadelphia warehouse. Id. at *36.Such evidence more than sufficiently supports the bargaining order. See Davis Supermarkets, Inc. v. NLRB, 2 F.3d 1162, 1176 (D.C. Cir. 1993) (affirming bargaining order where company's "large number of unfair labor practices, ... committed by some of the top officials in the company, and ... directed at numerous employees ... instilled a strong fear of union representation in the employees.") (internal quotation marks omitted).
 
 Balancing
 
 51
 Before enforcing a bargaining order, "we require the Board to explicitly balance three considerations: (1) the employees' Section 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act." Vincent Plastics, 209 F.3d at 738. Because of the Board's failure to balance these factors, we have repeatedly refused to enforce bargaining orders that have come before us in recent years. In Avecor, for instance, we declined to enforce a bargaining order because although "the ALJ briefly discussed the first two factors," he never considered the third, i.e., why traditional remedies, including a re-run election, would have been inadequate. 931 F.2d at 938. "The ALJ never explained," we said, "why the cloud created by these violations was likely to linger." Id. Rejecting another bargaining order in Charlotte Amphitheater Corp. v. NLRB, 82 F.3d 1074, 1078-1080 (D.C. Cir. 1996), we "searched the ALJ's decision but ...found no explanation of why a fair election would not be possible once the Company has been required to post notices and reinstate the improperly discharged employees with back pay." Id. at 1079.
 
 
 52
 In our most recent rejection of a bargaining order, Vincent Plastics, neither the ALJ nor the Board had provided any explanation for the order. Remanding the case with instructions to either provide an adequate justification or vacate the bargaining order, we expressed our frustration with the Board's continued recalcitrance: "What is ultimately dissatisfying about this familiar dance is not a sense that this court's institutional integrity is undermined by the Board's refusal to modify its behavior in response to operant conditioning, but that those left in the lurch are precisely those who, in this case, sought protection from the Board." Vincent Plastics, 209 F.3d at 739.
 
 
 53
 In this case, the ALJ explored in depth the need for the bargaining order. After summarizing Traction's "immediate, swift, and retributive" response to the union's organizing effort, including its threats to close or hire other workers, as well as the retaliatory section 8(a)(3) violations, the ALJ discussed the effect of those actions on Traction's employees. Traction, 1999 WL 1186753 at *35. The nature of Traction's unfair labor practices, he concluded, combined with the unit's size and the involvement of the two owners in the unfair labor practices, had created fear so pervasive that a re-run election would not fairly reflect the views of the majority of the unit. Id. at 35-36. Adopting the ALJ's recommendation and imposing a bargaining order, the Board rejected Traction's argument that "an effective alternative to a bargaining order" would be for a Traction representative to "read the notice to affected employees prior to the running of a second election."Id. at 1 n.2. "[S]uch a remedy," the Board explained, would be "insufficient to cure the gross interference with free choice in the election in this case." Id.
 
 
 54
 The Board's explanation suffers from none of the deficiencies that led to our rejection of bargaining orders in earlier cases. For instance, in Avecor the Board never explained "why the cloud created by [the employer's] violations was likely to linger." 931 F.2d at 938. Here, the ALJ carefully explained that the section 8(a)(3) violations, particularly Traction's threats to close the warehouse and its discriminatory discharge of Schiavone, were not only " 'hallmark violations' of the most pernicious type," but given the small size of the unit, likely not to have been forgotten. Traction, 1999 WL 1186753 at *35. Moreover, as the ALJ explained, the fact that the union, having once enjoyed majority support, garnered only two votes in the election provided additional evidence that Traction's unfair labor practices were both particularly effective and "likely to linger." Avecor, 931 F.2d at 938. In Charlotte Amphitheater, we "found no explanation of why a fair election would not be possible once the Company has been required to post notices and reinstate the improperly discharged employees with back pay." 82 F.3d at 1079.But here, the ALJ found that the magnitude of Traction's unfair labor practices, the small size of the unit, and the involvement of the company's two owners made its "campaign to undermine employee support for the Union through fear and intimidation" so successful that it was unlikely that traditional remedies would "eras[e] the effects" of that campaign. Traction, 1999 WL 1186753 at *36.
 
 
 55
 In view of the Board's thorough discussion, and keeping in mind our deferential standard of review, Gissel Packing, 395 U.S. at 612 n.32, we cannot imagine what more we could require the Board to say. Indeed, asked at oral argument what else the Board should have said, Traction's counsel had no response. In the end, we think the words of Gissel aptly describe this case: Having "succeeded in undermining [the] union's strength and destroying the laboratory conditions necessary for a fair election, [Traction would] see no need to violate a cease-and-desist order by further unlawful activity. The damage [had been] done." Id. at 612.
 
 Employee Turnover
 
 56
 We turn finally to Traction's argument that the Board failed to consider the effect of employee turnover between the time the unfair labor practices occurred and the issuance of the bargaining order. "[W]e have repeatedly instructed the Board to determine the appropriateness of a Gissel bargaining order in light of the circumstances existing at the time it is entered" rather than at the time of the election. Flamingo Hilton-Laughlin v. NLRB, 148 F.3d 1166, 1171 (D.C. Cir. 1998).
 
 
 57
 The Board argues that Traction waived this issue by failing to raise it during the administrative proceedings. Claiming that it had raised the issue, Traction points out that it excepted to the ALJ's "failure to consider the effect of mitigating circumstances on the need for a bargaining order."According to the company, this exception "put the Board on notice that Traction was challenging, inter alia, the ALJ's failure to consider the effect of employee turnover." We disagree. How could the Board have known that by "mitigating circumstances" Traction meant employee turnover? Not only did Traction fail to mention employee turnover in its brief to the Board, but the brief contained no citation to the pages of the record that the company now contends support its argument that employee turnover actually occurred.
 
 
 58
 We expect much of the Board, but we have never required it to sift through a six-hundred plus page record to find evidence supporting an argument that a petitioner never made. See Charlotte Amphitheaters 82 F.3d at 1080 ("[T]he Board has no affirmative duty to inquire whether employee turnover or the passage of time has attenuated the effects of earlier unfair labor practices...."). Because Traction does not claim that some "extraordinary circumstance" explains its failure to raise employee turnover, we may not consider the issue. See 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").
 
 IV
 
 59
 With the exception of that portion of the order requiring Traction to allow personal use of company vans, Traction's petition for review is denied and the Board's cross-petition for enforcement is granted.
 
 
 60
 So ordered.
 
 Randolph, Circuit Judge, concurring:
 
 61
 The Board thinks it an unfair labor practice for an employer, during an election campaign, to ask employees what they find wrong at the workplace. The Board's theory is that in making the solicitation, the employer implies that something will be done to correct whatever problems are identified, which in turn implies that the employees do not need a union. See Reliance Elec. Co., 191 N.L.R.B. 44, 46 (1971), enforced, 457 F.2d 503 (6th Cir. 1972). I have my doubts about this theory, but as the court points out, the company did not challenge it in this case. See op. at 13. The company's argument was that the evidence did not make out a violation, an argument the court's opinion rightly rejects. See id. at 14.