Filed: January 8, 2004

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 02-2344(L)
(11-CA-17507)

National Labor Relations Board,

Petitioner,

versus

Transpersonnel, Incorporated,

Respondent.

O R D E R

The court amends its opinion filed November 13, 2003, as follows:

On page 20, second full paragraph, line 5 -- the word "opinion" is added between "majority's" and "acknowledges."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
            *Petitioner,*

v.

TRANSPERSONNEL, INCORPORATED,
            *Respondent.*

No. 02-2344

TRANSPERSONNEL, INCORPORATED,
            *Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
            *Respondent.*

No. 02-2414

On Application for Enforcement and
Cross-Petition for Review of an Order
of the National Labor Relations Board.
(11-CA-17507)

Argued: June 5, 2003

Decided: November 13, 2003

Before WILKINSON, LUTTIG, and SHEDD, Circuit Judges.

Application for enforcement granted in part and denied in part, and cross-petition for review granted in part and denied in part by published opinion. Judge Shedd wrote the opinion. Judge Luttig wrote an opinion concurring in part and dissenting in part. Judge Wilkinson wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Donald Christopher Lauderdale, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Greenville, South Carolina, for Transpersonnel. Ruth Elizabeth Burdick, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Arthur R. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret A. Gaines, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

**OPINION**

SHEDD, Circuit Judge:

This case is before the Court on the application for enforcement filed by the National Labor Relations Board (the Board) and the cross-petition for review filed by the employer, Transpersonnel, Inc.

The Board determined that Transpersonnel violated § 8(a)(1), 29 U.S.C. § 158(a)(1), of the National Labor Relations Act (the NLRA or the Act) by unlawfully soliciting nine of its employees to sign anti-union statements. It also ruled that Transpersonnel violated § 8(a)(1) and § 8(a)(5), 29 U.S.C. § 158(a)(5), of the Act by withdrawing recognition from the General Drivers, Warehousemen and Helpers, Local 28, affiliated with International Brotherhood of Teamsters, AFL-CIO (the Union).

We conclude that substantial evidence supports a finding that Transpersonnel unlawfully solicited only two — not nine — of its employees. We also conclude that substantial evidence does not support the Board's finding that Transpersonnel unlawfully withdrew recognition of the Union. Therefore, we grant in part and deny in part the Board's application for enforcement, and we grant in part and deny in part Transpersonnel's cross-petition for review.

I.

As found by the Board,[1] Transpersonnel leases long-haul truck drivers to, among other customers, the Kohler Company in Spartanburg, South Carolina. Starting in 1993, the Union was the bargaining representative of the Transpersonnel employees at Kohler under a collective bargaining agreement. That collective bargaining agreement expired in September 1996. In February 1997, at least ten Transpersonnel employees working at Kohler commenced an economic strike. Two employees, Raymond Wray and Grant Crow, did not strike. It is undisputed that Wray did not support the Union.

By April 1997, Transpersonnel began hiring replacement drivers. It held an orientation meeting with the replacement drivers and Wray on April 6 at the Holiday Inn in Spartanburg. During that meeting, the employees circulated among themselves a piece of Holiday Inn stationery with handwriting at the top that stated "No Union." All six of the replacement drivers and Wray — a total of seven employees[2] — signed the document, which was later handed to a Transpersonnel official during a break in the meeting.

Over the next few weeks, Transpersonnel claims it obtained statements from five other employees who indicated they did not want to be represented by the Union. Combining these five statements with the seven signatures obtained at the April 6 meeting, Transpersonnel asserted that twelve employees in the unit did not want Union representation. On May 9, Transpersonnel informed the Union that it had "received objective evidence that [the Union] no longer represents a majority of our employees." J.A. 291. Based on this information, Transpersonnel withdrew recognition from the Union.

---

[1]The ALJ made findings, rulings, and conclusions, and the Board affirmed them. The Board also made findings, rulings, and conclusions that were consistent with the ALJ's in most respects. Where it is not relevant whether the ALJ or the Board made a particular finding, ruling, or conclusion, we indicate the Board made the determination.

[2]There were actually eight drivers who attended the meeting and signed the document. One of the drivers left Transpersonnel before it withdrew recognition of the Union, so whether this eighth driver supported the Union is immaterial.

In August 1997, the Board's General Counsel issued a complaint, alleging that Transpersonnel unlawfully solicited an unspecified number of employees to sign anti-union statements and unlawfully withdrew recognition of the Union. In May 1998, the ALJ decided that Transpersonnel unlawfully solicited nine employees and unlawfully withdrew recognition of the Union. The Board adopted the ALJ's recommended order in September 2001.

## II.

After a collective bargaining agreement expires, under the law applicable to this case, an employer may not withdraw recognition of a union unless the employer shows either that (1) the union did not in fact enjoy majority support, or (2) the employer had a good-faith doubt, founded on a sufficient objective basis, of the union's majority support. *Pirelli Cable Corp. v. N.L.R.B.*, 141 F.3d 503, 520 (4th Cir. 1998). The Board concluded that Transpersonnel failed to make either showing.

In making this determination, the Board found that there were as few as twenty-two employees in the Transpersonnel bargaining unit on May 9 — ten strikers who supported the Union and twelve drivers who did not strike.[3] Of these twelve drivers who did not strike, the Board decided that Transpersonnel improperly solicited anti-union statements from nine — the six replacement drivers who signed the "No Union" document during the April 6 meeting and three others who provided statements in the weeks following the April 6 meeting: Crow, Johnny Emerson, and Bradley Forkey. Therefore, although Transpersonnel claimed that it could rely on all twelve of the anti-union statements it received from the nonstriking employees, the Board concluded that Transpersonnel could rely on the anti-union declarations of only three of the twenty-two unit employees: Wray, Dean Hefner, and Franklin Harris. Accordingly, the Board concluded that Transpersonnel violated §§ 8(a)(1) and 8(a)(5) when it withdrew recognition of the Union.

---

[3]See *infra* at 17-18 for a discussion of how many employees were in the Transpersonnel unit on May 9.

III.

We must affirm the Board's factual findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Medeco Security Locks, Inc. v. N.L.R.B.*, 142 F.3d 733, 742 (4th Cir. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Diesel Co. v. N.L.R.B.*, 263 F.3d 345, 351 (4th Cir. 2001) (internal quotation omitted). If substantial evidence exists, we must uphold the Board's decision "even though we might have reached a different result had we heard the evidence in the first instance." *N.L.R.B. v. Daniel Construction Co.*, 731 F.2d 191, 193 (4th Cir. 1984).

IV.

The Board found that Transpersonnel violated § 8(a)(1) by improperly soliciting nine employees to provide anti-union statements. These nine are the six replacement drivers who attended the April 6 meeting, plus Crow, Emerson, and Forkey.

The test for a § 8(a)(1) violation is whether, "under all of the circumstances, the employer's conduct may reasonably tend to coerce or intimidate employees." *N.L.R.B. v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997) (internal quotation omitted). It does not matter whether the particular conduct by the employer was actually coercive. *Consolidated Diesel*, 263 F.3d at 352. Instead, the relevant inquiry is "whether the conduct in question had a reasonable tendency in the totality of circumstances to intimidate." *Equitable Gas Co. v. N.L.R.B.*, 966 F.2d 861, 866 (4th Cir. 1992) (internal quotation omitted). Whether particular conduct tends to coerce or intimidate is a question essentially left to the specialized experience of the Board, and we must show respect for the Board's findings. *Consolidated Diesel*, 263 F.3d at 352. Nevertheless, a reviewing court is empowered to set aside a Board's decision when the court cannot conscientiously find substantial evidence to support the Board's decision, when viewing the record as a whole including the body of evidence opposed to the Board's view. *Weirton Steel v. N.L.R.B.*, 689 F.2d 504, 507 (4th Cir. 1982).

## A.    *April 6 Meeting*

Transpersonnel scheduled an orientation meeting at the Spartan-burg Holiday Inn for its newly hired replacement drivers. Wray, one of the two drivers who refused to join the strike, also attended the meeting. Thomas Husvar, Transpersonnel's Regional Manager, led the meeting.

Husvar and Wray parked next to each other in the hotel parking lot and walked to the meeting together. Wray said to Husvar: "Tom, I don't want union representation. I don't think the people want union representation. What do we have to do?" J.A. 147-48. Husvar responded: "Those are very good questions. Why don't you ask those questions in the meeting . . . because I think everybody has the right to know . . . what their rights are." J.A. 148.

During the meeting, Wray repeated his question. In response, Husvar told the employees that they had the right to decide whether they wanted Union representation, that Transpersonnel could not influence their decision, and that if they did not want Union representation then Transpersonnel would need some sort of documentation evidencing their preference.

While the meeting proceeded, the employees circulated a piece of Holiday Inn stationery with the handwritten notation "No Union" at the top. All of the six replacement drivers and Wray signed the document. Husvar did not circulate the document, nor did he know that the employees were circulating it. One of the employees handed the note to another Transpersonnel manager during a break in the meeting and the document was eventually given to Husvar when the meeting resumed.

After the "No Union" document was handed to Husvar, one of the replacement drivers asked, "[W]hat do we do now?" J.A. 150. Husvar told the group that Transpersonnel could not do anything about the Union until a majority of the employees indicated that they did not want Union representation. Husvar also assured the replacements that they were permanent employees and that they would not lose their jobs even if the strike ended.

The complaint filed by the Board's General Counsel did not allege any unlawful conduct arising out of the April 6 meeting. In his opening statement to the ALJ, the General Counsel made no reference to the April 6 meeting.[4] Husvar is the only person who testified before the ALJ about that meeting, and the ALJ credited his testimony. The General Counsel did not attempt to elicit any testimony from any other person who attended the meeting.

In deciding that Husvar unlawfully solicited the replacement drivers to sign the "No Union" document, the Board found that Husvar failed to take a "neutral position" when asked by Wray in the parking lot what Wray and the new employees could do to get rid of the Union. J.A. 342. According to the Board, Husvar improperly directed Wray, who was clearly biased against the Union, to ask his question during the meeting in front of the other employees. Moreover, Husvar failed to object when the employees circulated the "No Union" document in his presence. The ALJ also found, without explanation, that it was improper for Husvar to tell the replacements that they would not lose their jobs even if the strike ended.[5]

The Board's finding of an unfair labor practice relating to the April 6 meeting is not supported by substantial evidence. Husvar's conduct during the April 6 meeting lacks all indicia of any tendency to intimidate or coerce.[6] Wray, not Husvar, initiated the question of how the

---

[4]It is clear that the General Counsel intended to focus on the alleged solicitations of three employees. He called only three drivers to testify: Forkey, Emerson, and Hefner. The General Counsel does not now argue that Transpersonnel improperly solicited Hefner's anti-union statement.

[5]Although the Board affirmed the ALJ's conclusions generally, the Board made no mention of this particular conclusion. The Board's silence is understandable in light of the opinion by the District of Columbia Circuit in *Mathews Readymix, Inc. v. N.L.R.B.*, 165 F.3d 74, 79 (D.C. Cir. 1999), which was issued after the ALJ's decision but before the Board's order. The court in *Mathews Readymix* recognized that replacement employees would naturally want to know how the conclusion of a strike would affect their employment status.

[6]The Board cites *Boren Clay Products Co. v. N.L.R.B.*, 419 F.2d 385 (4th Cir. 1970), to support its contention that Husvar unlawfully solicited the replacement drivers during the meeting. The Board's reliance on *Boren Clay* is misguided. In *Boren Clay*, the employer made "decidedly coercive" statements to its employees and withdrew recognition even though it knew the union enjoyed majority support. *Id.* at 385-86. No such evidence exists in this case.

employees could get rid of the Union. Wray told Husvar that other replacement drivers shared his opposition to the Union. It was prudent for Husvar, for the sake of uniformity and efficiency, to answer the question in a group setting rather than individually.

The Board determined that Husvar was not justified in relying on Wray's statement that other replacement drivers also wanted to get rid of the Union, because Wray was obviously biased against the Union. In support of this conclusion, the Board cited *Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359 (1998). The Board's reliance on *Allentown* is misplaced.[7]

The employer in *Allentown* relied on two employees who represented that other employees did not support the union. One of the two employees was a union steward. The Board determined that the employer should not have relied on the information provided by the steward. The Supreme Court disagreed, finding the information provided by the steward helped establish the employer's good-faith doubt about the majority status of the union. *Id.* at 370-71.

The Board in this case distinguished the nonhostile union steward in *Allentown* from Wray, the clearly biased employee. Based on this distinction, the Board found it improper for Transpersonnel to rely on Wray's statement that others shared his interest in getting rid of the Union. This conclusion, however, is belied by the Supreme Court's discussion of the second employee in *Allentown*.

The second employee in *Allentown* was not a steward. He told the employer that all of his fellow workers on the night shift did not want the union. The Board also found the employer improperly relied on this employee's statement. The Supreme Court again disagreed, holding that "absent some reason for the employer to know that [the employee] had no basis for his information, or that [the employee]

---

[7]The Board asserts that Transpersonnel waived its claim that it should be allowed to rely on Wray's representation by not raising this argument in its brief. We disagree. In its brief, Transpersonnel cited verbatim Wray's conversation with Husvar before the April 6 meeting. Moreover, because the Board relied on *Allentown* in deciding the case, we must determine whether its reliance was appropriate.

was lying, reason demands that the statement be given considerable weight." *Id.* at 370.

Because there is no evidence in the record that Wray lied or lacked a basis for his information, we find, consistent with the Supreme Court's decision in *Allentown*, that Husvar (and thus Transpersonnel) properly relied on Wray's assertion that other replacement drivers also wanted to know how to get rid of the Union.

Moreover, Husvar's answer to Wray's question during the meeting correctly stated both the law and the facts. Husvar assured the employees that each could decide for himself whether he wanted the Union. Husvar further informed the employees that Transpersonnel would need a document signed by them if they did not want to be represented by the Union.

Husvar's comments were not improper. It is not an unfair labor practice for an employer to provide accurate information in response to an employee's question, as long as the answer is not accompanied by any inducement or threat. *Terminix-Int'l Co.*, 315 N.L.R.B. 1283, 1287-88 (1995); *Lee Lumber and Building Material Corp.*, 306 N.L.R.B. 408 (1992). Husvar's answer was accurate and free of any inducement or threat.

The ALJ also found that Husvar's comment to the employees that they were permanent replacements and would keep their jobs even if the strike ended was coercive. We hold that this response by Husvar clearly was not coercive as a matter of law. Before the April 6 meeting, several employees asked the company about their status as replacement drivers. These replacement employees would naturally want to know whether they would be able to keep their jobs if the strikers came back to work. *See Mathews Readymix, Inc. v. N.L.R.B.*, 165 F.3d 74, 79 (D.C. Cir. 1999) (explaining that the Board may not ignore evidence that replacements might want the employer to withdraw recognition of the union to ensure keeping their jobs). Because several replacement employees had already asked the company about their status as replacement drivers and because it was likely that all of them would share the same concern, it was appropriate for Husvar to address this issue during the meeting.

Moreover, what Husvar told the new employees during the meeting about keeping their jobs is, of course, an entirely accurate statement of the law. If a strike is an economic strike (as it was at Transpersonnel), the employer need not terminate replacement workers when strikers seek to return to work; rather, the employer need only place its strikers on a preferential rehiring list and call them back when an opening becomes available. *Pirelli Cable Corp. v. N.L.R.B.*, 141 F.3d 503, 516 (4th Cir. 1998). Any effect this comment might have on the new employees' decision whether to join the Union is a consequence of the law rather than improper coercion or intimidation by the employer. *Id.* (finding a letter from the employer to its employees not threatening or coercive, because the letter merely stated the potential effect on the employment status of strikers if a strike ensued and replacements were hired); *Lee Lumber*, 306 N.L.R.B. at 410 ("Otherwise lawful statements do not become unlawful, however, merely because they have the effect (intended or otherwise) of causing employees to abandon their support for a union.").

Last, the Board determined that Husvar improperly influenced the replacement drivers by not objecting to the circulation of the "No Union" document. Husvar testified that he did not know the employees were circulating the "No Union" document. The Board credited this testimony. Nevertheless, the Board criticized Husvar for permitting the employees to circulate the document in his presence. The Board's conclusion is not supported by substantial evidence. Husvar could not object to the circulation of the document if he was unaware that the drivers were circulating it.[8]

---

[8]The ALJ relied on the Board's decision in *Mathews Readymix, Inc.*, 324 N.L.R.B. 1005, 1011, n. 16 (1997), to support its conclusion that Husvar improperly influenced the six replacement drivers who signed the "No Union" petition during the April 6 meeting. In that case, company officials (like Husvar) were present in a meeting where employees signed a decertification petition during a break. The company officials were not aware that the petition was being circulated. The Board in *Mathews Readymix* found that the company unlawfully withdrew recognition of the union.

The District of Columbia Circuit reversed the Board's decision and found no unfair labor practice relating to the meeting in question. *Mathews Readymix, Inc. v. N.L.R.B.*, 165 F.3d 74 (D.C. Cir. 1999).

For all of the above reasons, we find that the Board's conclusion that Transpersonnel unlawfully solicited the six employees to sign the "No Union" document is not supported by substantial evidence. Transpersonnel's conduct did not have a reasonable tendency in the totality of the circumstances to coerce or intimidate. Thus, Transpersonnel was entitled to rely on these six anti-union statements obtained during the April 6 meeting in deciding whether to withdraw recognition of the Union. Therefore, when these six statements are combined with the three undisputed statements, Transpersonnel properly relied on these nine anti-union statements.

### B.  *Grant Crow*

Crow, like Wray, worked for Transpersonnel before the strike. During the two years prior to the strike, he was pressured by the Union workers to join the Union but adamantly refused. He also refused to go on strike and crossed the picket line for two weeks but later asked Transpersonnel not to assign him to the Kohler account because he felt threatened by the strikers. Transpersonnel accommodated his request. Husvar was aware of Crow's nonsupport of the Union.

Crow periodically telephoned Husvar to find out the status of the strike, and after the strike quieted down, Husvar encouraged Crow to return to work at Kohler. In one such call by Crow to Husvar soon after the April 6 meeting, Husvar told Crow that the replacement workers had signed a document expressing that they did not want Union representation and that the number of those who did not want Union representation was growing. Crow responded: "You know how I feel about that. If there's anything I can do, I'll do it." J.A. 172. Husvar replied that if Crow wanted to express his position about the Union, he should send Husvar a letter. Crow asked Husvar to send him sample language of what to say in the letter, but Husvar told Crow to put it in his own words. Crow, however, again requested that Husvar send him sample language. Husvar sent Crow a sample letter in the mail. A few days later, Crow returned a letter to Husvar that stated, "I Grant L. Crow do not want the Teamsters to represent me when I drive at the Kohler Company." J.A. 313. Crow did not follow the sample language Husvar provided.

The Board erred by finding that Husvar's conduct would tend to intimidate or coerce. The undisputed testimony established that Crow initiated the telephone call and that Husvar accurately informed Crow of the status of the strike. It is further undisputed that Crow volunteered to take action to show his support for the anti-union employees. Crow specifically asked Husvar to send him sample language. Merely providing accurate information upon request of the employee, even for sample language, does not constitute conduct that would tend to coerce or intimidate. *Bridgestone/Firestone, Inc.*, 2001 WL 1076111 (N.L.R.B. 2001) (deciding that the employer provided only lawful, ministerial aid to its employee by drafting petition disavowing the union); *Ernst Home Centers, Inc.*, 308 N.L.R.B. 848 (1992). Because Transpersonnel did not unlawfully solicit Crow's statement, Transpersonnel was entitled to rely on Crow's disavowal of the Union. Thus, Crow's statement raises to ten the number of anti-union statements upon which Transpersonnel could properly rely.

## C. *Johnny Emerson*

The ALJ heard testimony from Emerson, Husvar, and Joanne Hurt, Transpersonnel's operations manager, regarding whether Transpersonnel improperly solicited Emerson. Although there was substantial variance in the testimony, especially as to the timing of the events, all the testimony was consistent in one respect: Emerson did not want union representation.

Husvar and Hurt testified that they received an unsolicited anti-union statement from Emerson before May 9. Emerson, on the other hand, testified that Hurt asked him later in May to send a statement, which he did. The ALJ credited the testimony of Emerson over Hurt's.

The balancing of the credibility of witnesses is at the heart of the fact-finding process, and it is normally not the role of reviewing courts to second-guess a fact-finder's determinations about who was the more truthful witness. *Fieldcrest Cannon, Inc. v. N.L.R.B.*, 97 F.3d 65, 71 (4th Cir. 1996). Thus, absent extraordinary circumstances, we will not disturb an ALJ's credibility determinations. *Sam's Club v. N.L.R.B.*, 173 F.3d 233, 240 (4th Cir. 1999). We decline to disturb the ALJ's credibility determinations, which were adopted by the

Board, regarding the testimony provided by Emerson, Husvar, and Hurt, and we enforce the Board's finding that Transpersonnel violated § 8(a)(1) by soliciting a statement from Emerson.[9]

We note, however, that, under the circumstances, this solicitation "can hardly be considered a grave violation of 8(a)(1)." *See N.L.R.B. v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 16 (4th Cir. 1971). The request for a statement was very brief and certainly restrained. Emerson testified that Hurt said

> something to the effect of what my feelings were about a union and working for a union. She didn't tell me one way or another. She just said, "Whatever your feelings are, put it down in a note and send it to me."

J.A. 79. Thus, Hurt's solicitation was "no more than a technical violation of 8(a)(1)." *Id.* at 16.

We further note that, even though Transpersonnel violated § 8(a)(1) by soliciting a statement from Emerson, that ruling does not necessarily mean that Transpersonnel could not rely on Emerson's dissatisfaction with union representation in deciding whether to withdraw recognition of the Union on May 9. A finding that an employer engages in conduct that has a reasonable tendency to coerce or intimidate does not necessarily mean that the employer may not rely on a decertification petition subsequently signed by an employee. *See Nu-Southern Dyeing*, 444 F.2d at 16. Employers may "avoid a bargaining order by showing that the unfair labor practices did not significantly contribute to such a loss of majority or to the factors upon which a doubt of such a majority is based." *Id.*

We need not, however, decide whether the solicitation of Emerson significantly contributed to the Union's loss of majority status or to Transpersonnel's good-faith doubt as to the Union's majority status. Another, more evident basis in the record establishes that the solicita-

---

[9]We also conclude that substantial evidence supports the Board's finding that Transpersonnel violated § 8(a)(1) by interrogating Emerson. We note, however, that the interrogation occurred after May 9 and did not affect Transpersonnel's withdrawal of Union recognition.

tion of Emerson could not have influenced Transpersonnel's decision to withdraw recognition of the Union on May 9. The only fair reading of the testimony credited by the ALJ reveals that the solicitation of Emerson occurred *after* May 9.[10] Accordingly, even if Emerson's statement obtained after May 9 was improperly solicited, Transpersonnel clearly did not rely on it when it decided to withdraw recognition of the Union on May 9.[11]

## D. *Bradford Forkey*

According to Forkey, Hurt interviewed him in early April. She informed Forkey that there was a strike in progress, and she asked him whether he minded working under that circumstance. Forkey said "no." J.A. 36. Hurt told him that as long as everything checked out on his application he could show up for work on April 13.

As directed, Forkey showed up for work on April 13. As he was stowing his luggage in the truck, his driving partner told him that he needed to see Husvar about signing a document. Husvar was at the terminal that morning in his car, so Forkey walked over to speak with him. Husvar told Forkey that he wanted him to sign a statement "about not belonging to the union. Or, wanting the union representation." J.A. 38. Forkey took a piece of paper out of his notebook, wrote a note indicating that he did not want Union representation, and handed it to Husvar.

Forkey did not know whether signing the document was a requirement of his starting work. He wrote the note because he needed to go to work. Forkey wrote the note of his own free will.

---

[10]The ALJ found only that the solicitation occurred sometime "in May 1997." J.A. 339. According to Emerson, whose testimony the ALJ credited, the facts, even when viewed most unfavorably to Transpersonnel, show that Emerson applied for the job on April 15 and started two weeks later, which would have been April 29. Hurt did not request Emerson's statement until at least two weeks after he started work, which would have been no earlier than May 13, and at any rate after May 9.

[11]For the discussion of whether Transpersonnel could validly rely on Emerson's opposition to the Union, see *infra* at 18-19.

The Board credited Forkey's testimony. Nevertheless, the Board concluded, contrary to Forkey's testimony, that "Husvar asked Bradford Forkey to sign a paper about not wanting Union representation." J.A. 338. This conclusion, which is the primary conclusion underlying the Board's finding as to the Forkey solicitation, is clearly not supported by substantial evidence. Husvar did not ask Forkey for a note saying that he did not want Union representation. Instead, Husvar merely asked Forkey for a statement indicating whether or not he wanted the Union.

Despite this errant finding, we have reviewed the record and find support for the Board's ultimate conclusion that Husvar unlawfully solicited Forkey.[12] Even though Forkey testified that he signed the statement of his own free will, we affirm the Board's decision that Husvar's conduct, under the totality of the circumstances, had a reasonable tendency to intimidate or coerce.

E.

In summary, the Board concluded that Transpersonnel unlawfully solicited a total of nine employees: the six replacement drivers at the April 6 meeting, Crow, Emerson, and Forkey. We find, however, that there is substantial evidence to support a finding of unlawful solicitation as to only Emerson and Forkey. Accordingly, of these particular nine employees, we find that Transpersonnel properly relied on the anti-union statements provided by seven: the six obtained during the April 6 meeting and Crow's. Combining these seven with the three undisputed statements, Transpersonnel properly relied on ten anti-union statements. In section V, we discuss whether Transpersonnel could rely on the disavowals of the Union by Emerson or Forkey in deciding whether to withdraw recognition of the Union.

---

[12]Although substantial evidence exists, it is very slim evidence at best. Like the violation involving Emerson, the Forkey violation also can hardly be considered a serious violation even under the circumstances credited by the Board.

V.

A.

The Board decided that Transpersonnel unlawfully withdrew recognition of the Union on May 9. We disagree.

Section 8(a)(5) of the Act makes it unlawful for an employer to refuse to bargain with its employees' certified union while the collective bargaining agreement is in effect. *Pirelli Cable*, 141 F.3d at 520. A union is usually entitled to a conclusive presumption of support by a majority of unit employees during the term of the collective bargaining agreement. *See Auciello Iron Works, Inc. v. N.L.R.B.*, 517 U.S. 781, 785 (1996).

After the collective bargaining agreement expires, however, the union enjoys only a rebuttable presumption of majority status. *Id.* at 786. Based on Board precedent in force when Transpersonnel withdrew recognition, to rebut this presumption, an employer must show either that (1) the union did not in fact enjoy majority support, or (2) the employer had a good-faith doubt, founded on a sufficient objective basis, of the union's majority support. *N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778 (1990).

To make the first showing, a petition signed by at least half of the bargaining unit's members indicating they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status. *N.L.R.B. v. D & D Enters., Inc.*, 125 F.3d 200, 209 (4th Cir. 1997). An employer may, however, rely on forms of proof other than a petition, so long as that other evidence objectively demonstrates a free and voluntary choice on the part of an employee to withdraw his support of the labor organization. *See Master Slack Corp.*, 271 N.L.R.B. 78 (1984).

As for the second showing, a good-faith doubt is a genuine, reasonable uncertainty about whether the union enjoys the continuing support of a majority of unit employees. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 367 (1998). Under the law applicable to this case, an employer may withdraw recognition of a union even

if the union continues to enjoy majority status, if the employer has a genuine, good-faith doubt whether the union continues to enjoy majority status. *See Levitz Furniture Co.*, 2001 WL 314139 at *7 (N.L.R.B. 2001); *Celanese Corp.*, 95 N.L.R.B. 664 (1951), *overruled in part by Levitz Furniture* at *17. The employer bears the burden of proving loss of majority status or good-faith doubt. *Virginia Concrete Co. v. N.L.R.B.*, 75 F.3d 974, 980 (4th Cir. 1996). Determining whether an employer has presented sufficient evidence regarding the loss of majority status or good faith-doubt is a question of fact for the Board, subject to limited review. *Id.* at 980. A reviewing court, nevertheless, must search the entire record for substantial evidence and in doing so must consider whatever in the record supports the Board's findings and also whatever fairly detracts from those findings. *Pirelli Cable*, 141 F.3d at 514.

## B.

## 1.

We first decide whether the Board's conclusion that Transpersonnel failed to establish that the Union "in fact" lacked the support of a majority of the unit employees on May 9 is supported by substantial evidence. The unit employees at Transpersonnel on May 9 included the *twelve* employees who crossed the picket line — the six replacement drivers who attended the April 6 meeting (Crow, Emerson, and Forkey) and the three undisputed Union opponents (Wray, Hefner, and Harris) — plus the strikers. *See Virginia Concrete*, 75 F.3d at 981 (ruling that an economic striker retains the status of employee entitled to vote within twelve months of a strike unless certain contingencies occur before the election).

The Board represents on appeal that there were *ten* employees who actively engaged in the strike. Board Brief, pp. 4-5, 43-45, 48.[13] After reviewing the record as a whole, we conclude that there were *ten*

---

[13]The ten strikers identified by the Board are: Merl Davidson, Vernon Payden, James Prater, Bobby Rice, Gary Scott, Frank Sellars, Jimmy Snyder, Bernard Swenson, Clyde Whitaker, and William Wilkins. J.A. 333, n. 8; Board Brief, pp. 4-5.

strikers on May 9.[14] Thus, the unit included a total of *twenty-two* employees: *ten* strikers and *twelve* nonstrikers.[15]

We presume that the ten strikers supported the Union on May 9. As for the twelve nonstrikers, it is undisputed that Transpersonnel received valid written disavowals of the Union from three employees: Wray, Hefner, and Harris. We have also concluded, contrary to the Board, that the "No Union" expressions by the six replacement drivers on April 6 were valid and the statement from Crow was properly obtained. Thus, of these twenty employees, *ten* supported the Union and *ten* did not. The only two employees unaccounted for in the total of twenty-two unit employees are Emerson and Forkey.

As for Emerson, based on the testimony credited by the Board, we find that Transpersonnel's improper solicitation of Emerson occurred after May 9.[16] We conclude, however, that Transpersonnel had, before May 9, other objective and reliable evidence that Emerson did not

---

[14]The exact number of strikers on May 9 is disputed by the parties. In the proceedings below, Transpersonnel asserted that there were nine strikers and twelve nonstrikers for a total of twenty-one unit members. The Union argued twelve strikers and twelve nonstrikers for a total of twenty-four unit members. The ALJ decided that there were at least eleven strikers. The ALJ declined to include the twelfth possible striker urged by the Union, Jerry McDaniel, because the "record evidence was not fully developed but it appears [McDaniel] was off work due to a disability, which prevented him from returning to work." J.A. 341.

In its order, the Board assumed *ten* strikers for a total of at least twenty-two unit members. In reaching this number, the Board assumed that McDaniel was not a striking employee based on the ALJ's finding. The Board further assumed that Earl Dople was not a striking employee because there was insufficient evidence in the record to determine his employment status.

[15]Even though the Board represents that there were only ten strikers, it indicates that there were twenty-three unit members. Board's Brief, pp. 9, 43. To get to twenty-three, however, either McDaniel or Dople must be included. The Board does not urge any basis in the record, and we find no basis, to conclude that either McDaniel or Dople should be included as strikers. Thus, we find that the record supports a finding of only ten strikers and only twenty-two unit members on May 9.

[16]See *ante* at 14, n. 10.

support the Union. Hefner, Emerson's driving partner for many years, specifically told Transpersonnel before May 9 that he wanted nothing to do with union representation and neither did Emerson. The Board found that Transpersonnel was justified in relying on this statement by Hefner as evidence that Emerson was dissatisfied with union representation. J.A. 343.

We find that the Board erred in deciding that Transpersonnel failed to meet its burden of showing that the Union had in fact lost the support of a majority of the unit members on May 9. Including Emerson, at least *eleven* of the *twenty-two* unit members at Transpersonnel did not support the Union. Therefore, the Union did not in fact enjoy majority status on May 9, and Transpersonnel did not violate §§ 8(a)(1) and 8(a)(5) by withdrawing recognition of the Union.[17]

2.

We next address Transpersonnel's alternative argument that it had a good-faith doubt whether the Union enjoyed majority status. We find, as an additional ground supporting our judgment, that the Board's decision that Transpersonnel failed to establish its good-faith reasonable uncertainty that the Union did not enjoy majority support on May 9 is not supported by substantial evidence.

The ten valid written statements of nonsupport of the Union — six from the April 6 meeting, plus Crow, Wray, Hefner, and Harris — and the oral representation by Hefner about Emerson's dissatisfaction with union representation create a good-faith doubt that the Union lacked majority support. At a minimum, Transpersonnel had a reason-

---

[17]Because we conclude that Transpersonnel may rely on Emerson's disavowal and it has thereby met its burden of establishing that the Union did not in fact enjoy majority support on May 9, we need not address whether Transpersonnel could also rely on Forkey's anti-union statement. *See Pirelli Cable*, 141 F.3d at 520-21 (outlining four factors to determine whether a decertification petition has been tainted by an employer's unfair labor practices); *Mathews Readymix*, 165 F.3d at 133 (holding that uncontested coercive interrogation of replacement employees did not taint the employees' signatures on the decertification petition).

able uncertainty whether these eleven of twenty-two employees supported the Union. *See Allentown Mack Sales*, 522 U.S. at 371-72 (holding that the employer established its good-faith doubt of union's majority status based on oral statements by fewer than half of the unit members).[18]

## VI.

For the forgoing reasons, we

> *GRANT IN PART AND DENY IN PART*
> *THE BOARD'S APPLICATION FOR ENFORCEMENT,*
> *AND GRANT IN PART AND DENY IN PART*
> *TRANSPERSONNEL'S CROSS-PETITION*
> *FOR REVIEW.*

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion for the court, with the exception of Part IV.D. From that part of the court's opinion, I dissent. Although the ALJ credited Forkey's testimony over Husvar's, Forkey's own testimony does not support the Board's adopted finding that he was illegally solicited — as the majority's opinion acknowledges. As the majority explains, the ALJ's "primary conclusion" supporting the illegal solicitation finding as to Forkey — *i.e.*, that Husvar asked Forkey for a

---

[18]We note that the good-faith defense is no longer available to an employer. In 2001, after the ALJ decided this case in 1998, the Board reversed its longstanding precedent by deciding that an employer may no longer withdraw recognition of a union based on a good-faith doubt. It ruled that an employer may prevail only by establishing that the union does not actually enjoy majority support. *Levitz Furniture Co.*, 2001 WL 314139 at * 11, 17 (N.L.R.B. 2001). The Board reasoned that it was inconsistent with the Act to allow an employer to withdraw recognition of a union based on a good-faith doubt even when the union in fact is supported by a majority of the unit employees. The Board's concern in *Levitz* is not implicated in this case, since we also find that the Union did not in fact enjoy majority support on May 9. Moreover, the Board gave its new rule in *Levitz* only prospective effect, so the good-faith doubt defense would still be available to Transpersonnel in this proceeding, even if it could not show that the Union in fact lacked majority support.

statement saying that he did *not* want union representation — is directly contradicted by Forkey's own testimony. Forkey testified that Husvar sought him out "merely [to] ask[ ] [him] for a statement indicating *whether or not* he wanted the Union," *ante* at 15 (emphasis added), and then Husvar accepted the note Forkey wrote him in response to his request. J.A. 38. Indeed, on the basis of this testimony by Forkey himself, the majority rejects as "clearly not supported by substantial evidence" the ALJ's conclusion that Husvar asked Forkey to sign a paper *that* he did not want union representation.

Notwithstanding Forkey's own testimony that he was merely asked for a statement as to whether or not he supported the union (which the majority accepts), *and without offering any other evidence in support of its conclusion that Forkey reasonably would have been intimidated or coerced*, the majority finds that substantial evidence supports the Board's judgment that Transpersonnel unlawfully solicited Forkey.

If we are prepared to affirm the Board's conclusion, we should at least be prepared to recite the evidence on the basis of which we render that disposition, even if (or especially if) that evidence is "very slim evidence at best," *ante* at 15 n.12. When the substantiality of evidence supporting a conclusion is challenged, mere conclusory statements that substantial evidence exists give rise to a legitimate inference that no such evidence exists in fact.

Because the majority rejects as "clearly not supported by substantial evidence" the ALJ's finding that Husvar asked Forkey to sign a paper that he did not want union representation; because it offers no evidence beyond this rejected conclusion in support of the Board's judgment that Husvar's conduct had a reasonable tendency to intimidate or coerce Forkey in the exercise of his section 7 rights; and because I am aware of no such evidence, I dissent from Part IV.D of the court's opinion.

WILKINSON, Circuit Judge, dissenting:

Many of Transpersonnel's drivers lawfully went out on an economic strike. Transpersonnel hired replacement workers and promptly used statements made by these replacement workers to decertify the union. The question before us today is not what we might have done

if faced with this case in the first instance. Rather, our review is limited to whether the Board took a permissible view of the evidence in finding that the company unlawfully solicited anti-union statements from its replacement employees. With all respect for my good colleagues, I think that the Board did.

The question of whether or not a company's actions would tend to coerce an average employee is one at the heart of the Board's expertise. An employer's conduct must be examined "in the context of its labor relations setting." *J.P. Stevens & Co. v. NLRB*, 638 F.2d 676, 687 (4th Cir. 1980) (citations omitted). In other words, a company's conduct must be judged by how a worker, who is economically dependent on an employer, would understand the company's actions.

In this regard, the Board's findings of fact must be sustained, even if a reviewing court "might have reached a different result had [it] heard the evidence in the first place." *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985) (citations omitted). Deference to the Board's findings of fact is particularly appropriate where credibility determinations are at issue, and "absent exceptional circumstances, the ALJ's credibility findings, 'when adopted by the Board are to be accepted by the [reviewing] court.'" *NLRB v. Air Prods. and Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983) (alterations in original) (citations omitted). Rather than according the appropriate deference to the ALJ who heard the testimony and then credited one set of inferences over another, the majority reconstructs the dynamics of the April 6 meeting in order to draw its own conclusions. In so doing, it has overstepped its bounds as a reviewing court.

The ALJ found that the conduct of Husvar and Burrell at the April 6 meeting had the tendency to coerce six replacement employees in the exercise of their rights, and the Board adopted this finding. The majority contends that this finding lacks support in the record because it concludes that the company was doing no more than giving out accurate information and acting in a neutral fashion. However, there is substantial evidence to support the Board's view that Husvar's conduct created an atmosphere in which the drivers would feel pressured to sign the "no union" petition.

The meeting was attended by a small group consisting mostly of newly-hired striker replacements. This gathering was their first offi-

cial meeting with the company. One of the purposes of the meeting was to discuss their employment status as replacements. The only non-replacement driver present was Raymond Wray, who began the session by asking, at Husvar's behest, what could be done to get rid of the union. Husvar responded by telling the drivers that the company would need some written proof of the employees' anti union sentiments in order to oust the union. It was hardly unreasonable for the Board to find that under the totality of the circumstances, Husvar's statement would tend to make the replacement employees feel that the company was trying to elicit anti-union statements from them. These newly-hired workers, replacement drivers whose standing with the company was bound to be of concern to them, would understandably want to please their employer. Because of the small number of employees at the meeting, the company would likely become aware of each and every individual who chose not to sign a "no union" note. Thus an employee who did not wish to sign the petition might nonetheless have done so rather than risk the boss's displeasure and be branded a union sympathizer right at the start of his employment.

Moreover, Husvar could simply have answered Wray's question when it was first asked rather than having him hold it until the meeting when all the workers would be present. The company defends this action as one of administrative efficiency, contending that Husvar was merely saving himself the trouble of repeating the information again at the meeting. But this assumes that at least some of the replacement workers had also independently decided that they wanted to decertify the union. Husvar had no indication of this except for Wray's statement "I don't want union representation. I don't think the people want union representation." Husvar did not know whether or not Wray had spoken to most, or even any, of the replacement workers before Husvar decided that all of the drivers needed to hear information on how to get rid of the union. While it is not a necessary inference that Husvar was trying to pressure these drivers in the exercise of their rights, it is certainly a permissible one. The Board's finding that Husvar's actions would tend to coerce newly-hired workers to sign a "no union" note at a small initial meeting presided over by the employer's chosen representatives is not without support in the record.

The right to self-organization is the fundamental guarantee of the National Labor Relations Act. *See* 29 U.S.C. § 157 (2000). To that

end, employers are forbidden to "interfere with, restrain, or coerce employees in the exercise of [their] rights." 29 U.S.C. § 158(a)(1). The Act makes clear that companies are to maintain neutrality towards the union, taking no actions which might encourage or discourage employees' union activities. The Board found that Transpersonnel did not abide by these rules when dealing with its employees. We may not have come to the same conclusion if we were viewing this case in the first instance, but the Board's finding had support in the record and therefore should be sustained. Because I would uphold the Board's findings with respect to the April 6 meeting, I have no reason to reach the other alleged violations of the Act. I would thus enforce the Board's order and deny the cross-petition for review.