**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1278**

MEC CONSTRUCTION, INCORPORATED,

Petitioner,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent.

**No. 05-1421**

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

MEC CONSTRUCTION, INCORPORATED,

Respondent.

On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board.  (6-CA-34417)

Argued:  November 29, 2005          Decided:  January 13, 2006

Before WILLIAMS, KING, and GREGORY, Circuit Judges.

---

Petition for review denied and cross-application for enforcement granted by unpublished per curiam opinion.

---

**ARGUED:** Gregory Guidry, ONEBANE LAW FIRM, Lafayette, Louisiana, for MEC Construction, Incorporated. Jason Walta, NATIONAL LABOR RELATIONS BOARD, Office of the General Counsel, Washington, D.C., for the Board. **ON BRIEF:** Michael P. Maraist, ONEBANE LAW FIRM, Lafayette, Louisiana; Gregory A. Morgan, YOUNG, MORGAN & CANN, Clarksburg, West Virginia, for MEC Construction, Incorporated. David Habenstreit, Supervisory Attorney, Arthur F. Rosenfeld, Acting General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIUM:

MEC Construction, Inc. (MEC) petitions this Court for review of the National Labor Relations Board's (Board) September 13, 2004 Decision and Direction, which rejected MEC's challenge to three ballots cast in a union representation election and resulted in the election being certified for Pipeliners Local Union 798 (Union). After the Board rejected the challenge, MEC continued to refuse to bargain with the Union, resulting in a finding by the Board that MEC was in violation of the National Labor Relations Act. MEC now petitions for review and the Board cross-petitions for enforcement of its order. For the following reasons, we deny MEC's petition for review and grant the Board's cross-petition for enforcement.

I.

MEC is a construction company based in West Virginia that specializes in gas plant construction, bridge work, and industrial construction. MEC, like many construction-industry companies, had a continually fluctuating work force. Accordingly, the total number of workers employed by MEC ranged anywhere from approximately 75 employees to 200 employees, depending on the amount of work available at any given time.

In November 2003, the Union petitioned to represent a unit of regularly employed rig welders and certified welders who at times performed work for MEC. Because the bargaining unit was comprised

3

of construction employees who were subject to sporadic employment, the parties stipulated that the eligibility of voters would be determined according to a specific formula tied to the number of days the employee had worked for MEC within the past year or two years. If an employee was fired for cause or voluntarily quit before the election, however, he was ineligible to vote.

The mail ballot election was held between December 17, 2003 and January 7, 2004. The initial results showed eight votes in favor of the Union, ten votes against the Union, and an additional five challenged ballots. Because the challenged ballots could be outcome determinative, the Board's Regional Director ordered a hearing to determine whether the ballots should be counted.

The Union challenged the ballot of one voter -- Brian Jarvis -- arguing that he was terminated for cause prior to the election. Before the hearing, MEC agreed that Jarvis's ballot should not be counted. The remaining four challenges were made by MEC with respect to the votes of Carl Hogue, Jr., David Swiger, Matthew Saliga, and Carl Neal, all of whom voted in favor of union representation. During the hearing, MEC withdrew its objection with respect to Neal, resulting in a tally of 9 votes for the Union and 10 against. Thus, if any two of MEC's three remaining challenges were overruled, there would be a majority of votes cast for the Union.

The remaining three challenges were heard by a hearing officer on February 10, 2004. The chief dispute concerned whether Hogue, Swiger, and Saliga quit their employment prior to casting their votes.

Hogue is a Texas resident who worked for MEC sporadically for approximately ten years. Hogue's practice was to travel from Texas to job sites in West Virginia and Pennsylvania when the project provided enough hours to make it worthwhile.

During September 2003, an informational picket line was set up at Hogue's job site in Pennsylvania. Hogue refused to cross the picket line and returned home to Texas. In November of that year, the Union's business agent contacted David Alvarez, MEC's president, and made an unconditional offer on behalf of the striking employees to return to MEC. Alvarez accepted the offer and agreed to contact the striking employees -- including Hogue -- and invite them back to work. Alvarez testified that he called Hogue and left a general message on an answering machine asking Hogue to call him, but that Hogue never responded to the call.

At the hearing, MEC argued that Hogue's failure to reply to Alvarez evidenced his intent permanently to sever his relationship with MEC. The hearing officer disagreed, relying on the facts that (1) Hogue never notified MEC of his intention to quit, (2) not working for a period of time was consistent with Hogue's employment history with MEC, (3) Hogue actually cast a ballot, and (4) Hogue

5

was willing to testify by phone at the hearing.[*] Accordingly, the hearing officer recommended overruling the challenge to Hogue's ballot.

Saliga, the second challenged voter, began working for MEC in October 2002 at its Hastings electric compressor station project (Hastings Project). As part of the Hastings Project, MEC employed a significant number of rig welders, who were under the direct supervision of David McPherson, a MEC Project Superintendent. Saliga, a welder, had been working 60-70 hours per week at the Hastings Project for a considerable stretch of time. He repeatedly asked McPherson for a temporary layoff so that he could take a vacation, but McPherson denied the layoff because the project was not completed.

Saliga testified that in April 2003, he asked Alvarez for time off to go turkey hunting, thinking that Alvarez was more likely than McPherson to grant the layoff. According to Saliga, Alvarez granted the time off and Saliga informed McPherson. Alvarez, however, testified that he never had such a conversation with Saliga, and McPherson likewise testified that Saliga simply failed to report for work. Saliga testified that after his return from hunting, he was unsuccessful in his attempts to contact Alvarez and McPherson. Eventually, he contacted McPherson at home, but

---

[*]MEC objected to Hogue testifying by telephone and his testimony was not allowed.

6

McPherson informed him that he had no work available. Accordingly, Saliga began working for a different contractor.

The hearing officer found that Alvarez's and McPherson's testimony was "inconsistent" and "troubling." Although they claimed that they could not grant Saliga a layoff because work was so hectic, evidence was presented that another Hastings Project welder was given a week off to go turkey hunting during the same period. In short, the hearing officer found Saliga's testimony to be credible, and Alvarez's and McPherson's testimony not to be credible. Accordingly, the hearing officer recommended that the challenge to Saliga's ballot be overruled.

Swiger, the third (and final) challenged voter, had worked sporadically for MEC for approximately six years. In April 2003, he expressed his desire to pursue other work, although he also maintained that he did not wish to "burn bridges" with MEC. (J.A. at 35-36.) After completing a job for MEC, Swiger placed his West Virginia home on the market and relocated to North Carolina in an attempt to find employment with NASCAR. Unable to sell his West Virginia home, however, he reluctantly returned the following winter. Swiger then contacted Alvarez, who informed Swiger that he had no work available at that time.

At the hearing, MEC argued that by attempting to find work in another industry, Swiger affirmatively severed his job with MEC. The hearing officer, however, disagreed, and based partly on

7

credibility determinations, found that Swiger did not voluntarily quit his job, and was thus eligible to vote.

The Board, in a two-to-one decision, subsequently adopted all of the hearing officer's findings and recommendations. Accordingly, the Board overruled MEC's challenges to the ballots of Hogue, Saliga, and Swiger. The Board's decision resulted in a final vote tally of twelve votes in favor of representation and ten votes against. MEC, unsatisfied with the Board's decision, refused to recognize and bargain with the Union, resulting in the Board finding that MEC was in violation of 29 U.S.C.A. § 158(a)(1) and (5) (West 1998).

MEC filed a petition for review contesting the Board's decision with respect to the ballots of Hogue, Saliga, and Swiger. The Board filed a cross-petition for enforcement. If we agree with the Board with respect to any two of the three challenged ballots, we will enforce its order. We have jurisdiction under 29 U.S.C.A. § 160(e) and (f) (West 1998).


II.

We review Board decisions with great deference because "Congress has entrusted the [Board] with broad discretion to establish procedures and safeguards to 'insure the fair and free choice of bargaining representatives by employees.'" NLRB v. Coca-Cola Bottling Co., 132 F.3d 1001, 1003 (4th Cir. 1997) (quoting

NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946)). Accordingly, "this Court treats the outcome of a Board-certified election as presumptively valid . . . [and if] seeking to have an election set aside, the objecting party bears a 'heavy burden.'" Id.

The Board's factual findings must be affirmed if they are "supported by the substantial evidence on the record considered as a whole." 29 U.S.C.A. § 160(e); NLRB v. Transpersonnel, Inc., 349 F.3d 175, 179 (4th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Transpersonnel, 349 F.3d at 179 (internal quotation marks omitted). Most importantly, if we find that substantial evidence exists, the NLRB's decision must be upheld "even though we might have reached a different result had we heard the evidence in the first instance." Id. (internal quotation marks omitted).

Moreover, "absent extraordinary circumstances, we will not disturb [a hearing officer's] credibility determinations." Id. at 184. We recognize that credibility determinations are "at the heart of the fact-finding process," and reviewing courts should be careful not to second-guess the factfinder, who was actually present during the testimony. See id.; Sam's Club v. NLRB, 173 F.3d 233, 240 (4th Cir. 1999).

Prior to the election, MEC and the Union stipulated that the eligibility of voters would be determined according to the NLRB's

Steiny/Daniel formula.  In Steiny & Co., 308 NLRB 1323 (1992), and Daniel Constr. Co., 133 NLRB 264 (1961), the Board created a special formula to be used in construction worker elections because the "construction industry is different from many other industries in the way it hires and lays off employees."  Steiny, 308 NLRB at 1324.  The formula recognizes that "construction employees may experience intermittent employment, be employed for short periods on different projects, and work for several different employers during the course of a year."  Id.  Accordingly, the formula is designed to ensure that construction-industry employees with a direct interest in a company are allowed to vote in any representative election.

Under the formula, an employee is eligible to vote if he (1) was employed by the company for 30 working days or more within the 12 months preceding the eligibility date for the election, or (2) had some employment with the company during the 12-month period, and had been employed for 45 working days or more within the 24-month period preceding the eligibility date.  Steiny, 308 NLRB at 1326.  The formula, however, also excludes those employees who were fired for cause or quit voluntarily prior to the election, no matter the duration of their prior employment.  See Metfab, Inc., 344 NLRB No. 6, 2005 WL 263701, at *13 (Jan. 31, 2005) ("Employees who had been terminated for cause or quit voluntarily prior to completion of the last job for which they were employed would not

10

be eligible under this formula."). Employees who were merely laid off prior to the election, however, are eligible to vote because the construction industry deems them eligible to recall when the need arises. Cf. NLRB v. Atkinson Dredging Co., 329 F.2d 158, 162 (4th Cir. 1964) (noting that an employee who is laid off with a "reasonable expectation of being called back" should typically be included in a voting unit). With this proper framework in mind, we now address MEC's challenges with respect to Hogue, Saliga, and Swiger.

## A.

MEC argues that the Board ignored substantial, objective, and uncontroverted evidence that Hogue affirmatively abandoned his job. Specifically, MEC points to the message Alvarez left on Hogue's answering machine and Hogue's subsequent failure to return Alvarez's telephone call.

"It is presumed that an economic striker . . . is eligible to vote. To rebut the presumption, the party challenging the vote must affirmatively show by objective evidence that he has abandoned his interest in his struck job." P.B.R. Co., 216 NLRB 602, 603 (1975). The key question with respect to Hogue's ballot, then, is whether substantial evidence supports the Board's finding that MEC failed to rebut the presumption via objective evidence. We conclude that it does.

11

MEC put forth no direct evidence that Hogue affirmatively abandoned his interest in his job. As the Board recognized, MEC instead "relie[d] solely on the fact that Hogue failed to respond to a message Alvarez left on his answering machine indicating that work was available." (J.A. at 63.) MEC, however, relying on Q-T Tool Co., 199 NLRB 500 (1972) and Axelson, Inc., 285 NLRB 862 (1987), argues that Hogue's failure to respond is legally sufficient to signify his abandonment of employment.

In Q-T Tool, the Board found that two workers were ineligible to vote in a union election because after their layoffs they secured permanent work elsewhere and also failed to respond to the company's recall letters. 199 NLRB at 502-03. In Axelson, the Board found that the employee in question had abandoned his job when he failed to respond to the company's specific recall letter, which designated the time and location that he was to return to work. 285 NLRB at 897-99.

These two cases are inapposite. First, MEC put forth no evidence suggesting that Hogue sought or accepted permanent employment elsewhere, like the employees in Q-T Tool. Second, Alvarez did not send Hogue a specific letter instructing him on the time and place of recall; rather, Alvarez left a single message on Hogue's answering machine that failed to specify when and where Hogue should return to work. And most importantly, these cases did not arise in the context of the construction-industry, where it is

12

common for employees to alternatively work for multiple employers during the course of the year. See Steiny, 308 NLRB at 1324.

Because this appeal concerns the sporadic construction industry, even if Hogue's failure to respond to the message -- assuming it was received -- evidenced his desire to decline recall in this instance, it cannot automatically be presumed to evidence a desire to abandon his relationship with MEC. See Metfab, Inc., 2005 WL 263701, at *14 ("There is nothing in the Board's decisions in Steiny or Daniel that expressly holds that an employee who has worked the requisite amount of time for an employer loses eligibility by declining recall.").

The Board found that Hogue's conduct was entirely consistent with his ongoing employment relationship with MEC, in which he traveled east for work only when it was worthwhile. We conclude that substantial evidence supports the Board's finding that MEC failed to show that Hogue abandoned his employment with the company.

B.

We now address MEC's arguments with respect to Saliga. MEC contends that because a significant amount of welding work remained on the Hastings Project, it would not have granted Saliga a voluntary layoff. MEC also contends that the Board erred in accepting the hearing officer's credibility determinations, which

13

MEC argues were unreasonable and contradicted by other findings of fact. We disagree.

During the hearing, Saliga testified that he was granted a voluntary layoff by Alvarez so that he could take a brief vacation, and that after returning, he contacted MEC about returning to work before starting work elsewhere. Alvarez and McPherson, however, testified that Saliga simply walked away from his job and quit without notice. Thus, the hearing officer was presented with irreconcilable testimony and found Saliga's testimony to be more credible. In fact, the hearing officer found Alvarez's and McPherson's testimony "inconsistent with their actions" and other portions of Alvarez's testimony with respect to Saliga "troubling." (J.A. at 34.) The hearing officer found Saliga's testimony, however, "quite plausible. . . . especially considering Saliga's demeanor." (J.A. at 34.)

We decline to disturb the hearing officer's credibility determinations. The hearing officer was in the best position to observe the demeanor of the respective witnesses, and MEC offers no persuasive reason for us to "second-guess [the hearing officer's] determinations about who was the more truthful witness." Transpersonnel, Inc., 349 F.3d at 184. Moreover, because the Union introduced uncontroverted evidence that another welder was given a voluntary layoff to go turkey hunting at the same time, there was

14

substantial objective evidence to support the Board's conclusion even absent the hearing officer's credibility findings.

C.

Because we conclude that substantial evidence supports the Board's ruling with respect to Hogue and Saliga, we need not -- and do not -- decide whether substantial evidence supports its decision with respect to Swiger.

III.

In summary, we hold that substantial evidence supports the Board's findings that Hogue and Saliga were eligible to vote in the Union election. Accordingly, there are a sufficient number of votes in favor of the Union to sustain the Board's ruling. We therefore deny MEC's petition for review and grant the Board's cross-application for enforcement.

PETITION FOR REVIEW DENIED AND<br>CROSS-APPLICATION FOR ENFORCEMENT GRANTED